[No. 42159.    En Banc.    June 22, 1972.]

EUGENE M. MOEN *et al., Respondents,* v. C. G. ERLANDSON *et al., Petitioners.*

*Slade Gorton, Attorney General, Wayne L. Williams, Assistant, Christopher T. Bayley, Prosecuting Attorney, Wil-*

756

liam R. Creech, Deputy, A. L. Newbould, and E. Neal King, for petitioners.

Eugene M. Moen and Barry E. Barnes, for respondents.

FINLEY, J.—This case comes before us on a writ of certiorari from a decision of the superior court declaring the 1 year durational voting residency requirement of Const. art. 6, § 1 and RCW 29.07.070 and 29.07.080 to be in violation of the fourteenth amendment to the United States Constitution, and enjoining election officials from enforcing it. *Dunn v. Blumstein,* 405 U.S. 330, 31 L. Ed. 2d 274, 92 S. Ct. 995 (1972), is controlling authority; consequently, we affirm the decision of the superior court.

This matter was presented in the Superior Court for King County upon an agreed statement of facts which reveals that all plaintiffs had moved to Washington from out of state and had established residence in Seattle.[1] All plaintiffs contacted the appropriate Seattle election officials and attempted to register to vote. They were told that they were ineligible to register to vote until they had lived in the state of Washington for 11 months. As a result, plaintiffs were unable to vote in the general election of November 2, 1971. They brought this action (a) seeking a declaratory judgment that Const. art. 6, § 1, is violative of the United States Constitution, and (b) also asking that the Seattle election officials be permanently enjoined from enforcing the 1 year durational voting residency requirement of Const. art. 6, § 1 and RCW 29.07.070 and 29.07.080. The superior court, as mentioned above, held the foregoing provisions of state law were in violation of the United States Constitution and enjoined the defendants from enforcing them.

The issues presented in this case were recently decided by the United States Supreme Court in *Dunn v. Blumstein,* *supra.* In holding Tennessee's durational residency require-

[1]Plaintiffs Moen moved to Seattle on December 1, 1970; plaintiffs Goodman, on July 22, 1971; and plaintiffs Czeisler, on August 1, 1971.

ments of (a) 1 year in the state and (b) 3 months in the county prior to voting registration, unconstitutional, the court stated:

> Fixing a constitutionally acceptable period is surely a matter of degree. It is sufficient to note here that 30 days appears to be an ample period of time for the State to complete whatever administrative tasks are necessary to prevent fraud—and a year, or three months, too much.

405 U.S. at 348. The court held further that durational voting residency requirements are unconstitutional unless the state can demonstrate that such laws are necessary to promote a compelling state interest.

Nothing distinguishes this case factually from *Blumstein.* The State of Washington has failed to demonstrate any compelling state interest that would justify its requirements of a 90-day county and a 1-year state residency prior to voting. Accordingly, the 90-day and the 1-year durational residency requirements specified by Const. art. 6, § 1 and RCW 29.07.070 and 29.07.080 are, per *Blumstein,* violative of the United States Constitution. Additionally, we observe in passing that durational residency requirements of more than 30 days cannot be constitutionally sustained unless it can be clearly demonstrated that they are required by a compelling state interest.

At this point in history, it seems to us it should be undebatable that our United States Constitution and the decisions of the United States Supreme Court interpreting the constitution are the supreme law of the land. Furthermore, despite contentious thinking, views, and actions to the contrary in the past and today in some expected and unexpected quarters, nothing is more basic to our system of government, its continuation, viability, and vitality, than this long-recognized, accepted and well-established principle. The alternative—purely and simply—would be anarchy with every man a law unto himself, with no one secure in person or effects from the personal peccadillos and the either rational or irrational idiosyncrasies and motivations of others.

As emphasized above, the instant case cannot be distinguished either factually or legally from the *Blumstein* case. The only problem in the instant case, if there is one, is whether we should be swayed by and should follow individual personal views and values (no matter how strongly held, and whether or not history should prove them to be meritorious or merely personal idiosyncrasies), or whether we should follow and give effect to the law of the land. Unless we deliberately and voluntarily choose to violate our own oaths of office and the supreme law of the land, there is no choice in the instant case. On the basis of the controlling authority of *Blumstein*, the judgment of the trial court must be affirmed. It is so ordered.

HAMILTON, C.J., ROSELLINI, HUNTER, NEILL, STAFFORD, WRIGHT, and UTTER, JJ., concur.

HALE, J. (dissenting)—What we have before us is a clinical picture of the constitution interpreted according to the travel syndrome. As far as I can discern, whatever connection exists between the court's opinion—and *Dunn v. Blumstein*, 405 U.S. 330, 31 L. Ed. 2d 274, 92 S. Ct. 995 (1972), upon which it depends—and the constitution of the United States is purely coincidental.

Both cases, I fear, ignore the basic premise that ours is a free government of separated and balanced powers so declared in the words and phrases of the constitutions. The two cases fail to recognize that, whereas the judiciary has been established as the ultimate check and balance upon the legislative and executive power, there is no corresponding check and balance upon the judicial power except intellectual restraint, the language of the constitutions, and common sense. In this case, as in the Tennessee case, I perceive a grave breach of the separation of powers principle, a colossal ballooning of the Fourteenth Amendment, a co-related abuse of the judicial power, and a want of common sense. In breaching the separation of powers doctrine, as it is structured in the constitution, the two cases work an equally unconstitutional abridgment of the basic powers of

self-government. Although they appear to acknowledge that a state has a valid, overriding and vital interest in maintaining the integrity of its political process, and in identifying traveler and citizen, the two opinions proceed to strip the state of its readiest, most economical and fairest means of protecting those interests. I therefore dissent to this court's opinion and, accordingly, would express my disagreement with *Dunn v. Blumstein, supra,* upon which it rests.

Travel, it is said, broadens one's horizons. Quite likely, too, it is an essential fact of life, for it has been an enduring phenomenon common to all cultures from the nomadic to the modern. Travel has been so pervasive an ingredient of life, primitive and modern, that, like the weather, the draftsmen of our constitutions apparently saw no need to secure it as a privilege in writing, nor to prescribe it as an interpretive aid to the constitutions or to the many amendments adopted since the Fourteenth. It remained for the judiciary to devise a new approach to constitutional interpretation, based not on what the language says or fails to say or what is expressed or implied, but rather on how the whole thing affects or is affected by travel.

Among the many impediments to travel are chiefly its expense and its discomfort, and these render minuscule in comparison the disadvantage that, while traveling, one cannot vote. Unfortunately, neither court suggests any means of lightening the traveler's burdens and alleviating the cost and discomfort except, after a short stay, to allow him to vote. But whether the traveler is in search of broader horizons, greener pastures, a job, or is a fugitive, and whatever indirect burdens a reasonable residence provision may put upon him, a state should be held to act within its constitutional power, I think, in discouraging travel undertaken with the primary purpose of voting or running for public office. In welcoming the weary traveler, the state is not obliged to include instanter in its hospitality all of the attributes of state citizenship.

If the traveler would tarry awhile—under our state con-

stitution for a period of a year—then, of course, it is right that he be entitled to exercise all of the rights and privileges of the state's citizenship. If, however, he is merely passing through or sojourning here, then it ought to be within a state's powers—all the while granting him the rights vouchsafed him in the Bill of Rights and assuring him of his extraconstitutional right of travel—to deny him voting privileges until he has made up his mind to stay, and evidenced this intention by remaining for a reasonable time.

These, I think, are the qualities of travel as they affect principles of constitutional law and our structure of government. Unless a state lays a direct burden on the right to travel or seeks to close its borders to the traveler, traveling as a juridical phenomenon should be given no more a conceptual effect in constitutional law than, for example, breathing. The right to travel, like the more fundamental right breathing, simply does not enter the constitutional arena unless it is directly denied, abridged or penalized.

That the courts see in the prosaic and mundane provision of a state constitution prescribing 1 year's residence in the state as a requirement for voting an abridgment of the right to travel, comes as a surprise. Outside an appellate court, one would be hard put to relate the two ideas to each other. On its face, one could well assume, whether lawyer or layman, that requiring a year's residence for voting had nothing whatever to do with travel. The converse of the proposition would be a holding that any residence requirement at all constitutes an unconstitutional penal servitude in violation of the Thirteenth Amendment to the United States Constitution abolishing slavery because it forces one to remain resident within a geographical area in order to exercise a constitutional right. Like two ships passing silently and safely in the night, neither the freedom to travel nor the right to vote seems to bother each other in any way.

The two opinions seem to confront us with a new principle of constitutional interpretation, one arising neither

from the constitution itself nor evolving from the process of balancing the express and implied powers of and limitations upon government, but rather an idea springing full-panoplied from the judicial mind, having only the most remote and extraneous relationship with the words, phrases or spirit of the constitution. We thus encounter a principle invented to fit the occasion, made manifest first in *Dunn v. Blumstein, supra,* and now by this court, that all constitutional provisions, statutes, ordinances and resolutions may be tested and, accordingly, their validity made to depend on whether it can be said of them that they somehow impinge on freedom of travel.

For centuries, this novel and ingenious idea somehow has remained undiscovered by the framers of the Constitution of the United States and the 50 states of the union, the Congress, all of our presidents, and by the 50 state legislatures, and it has also evaded the judiciary. Never, to my knowledge, has an amendment been even proposed, much less adopted, that freedom to travel shall be the ultimate measure upon which the constitutionality of all law depends. Now, with the emergence of this latest of many current juridical discoveries, all provisions of the federal and state constitutions, acts of Congress, state statutes and municipal ordinances must be assessed in its measure. It remained for the judiciary not only to write a travel amendment, but to adopt it instanter.

Vast congeries of the written law must now be squared with the new travel principle or be set aside. Any statute or constitutional provision requiring a person to be at a given place at a stated time, attend court, qualify for and obtain a permit or license, send one's children to school, file reports with the state and municipal government at prescribed places and times, or do or refrain from doing those many acts ordained or forbidden by law, is now of doubtful validity as it necessarily impinges upon the freedom to travel far more directly than does the state constitution's durational residence requirements for state suffrage.

Why residence requirements of no more than 1 year are

unconstitutional remains unclear in the two cases. After all, under our state constitution, the year starts to run from the time the prospective voter arrives in this state, establishes his abode here, and develops a subjective intent to remain. During that interval he is as free as the gulls which soar above the waters of Puget Sound; all that he needs for travel is the money and the inclination. Thus, the assertion in *Dunn v. Blumstein, supra* that, under the constitution of Tennessee, "Travel is permitted, but only at a price; voting is prohibited," does no more than state the obvious truism that, although the constitution of Tennessee puts no strictures whatever on freedom to travel, the traveler cannot at the same time enjoy both rights, travel and voting. And the further assertion in *Dunn v. Blumstein,* 405 U.S. 330, 31 L. Ed. 2d 274, 92 S. Ct. 995 (1972), that "The right to travel is 'an *unconditional* personal right,' a right whose exercise may not be conditioned," declares either a constitutional rule of earthshaking and overwhelming dimension or a meaningless absurdity. After all, even the writ of habeas corpus, that cherished and fought-for right, has no such absolute qualities, for it may be suspended when in cases of rebellion, or invasion, or the public safety may require it (U.S. Const. art. 1, § 9), and it was in fact ordered suspended by President Lincoln during the Civil War.

There is only a germ of truth in the aphorism that the constitutions are what the judges say they are. To the contrary, the country was founded and has survived upon the basic premise that the constitutions are what the constitutions say they are. Since the right to travel is not mentioned in either constitution and is simply one of those basic rights common to all truly free peoples, the right to travel provides no key to interpretation of either constitution unless the law under examination places some kind of a direct burden upon or is designed to abridge it. To read the suffrage qualification as an impairment of the civilized right to travel and equate that right with those spelled out in the Bill of Rights makes it a right absolute, unconditional, undeniable and all-encompassing. Despite the asser-

tion in *Dunn v. Blumstein, supra,* however, that it is unconditional and absolute, common sense tells us that the right to travel of necessity must yield, for example, to the emergent necessities of incarceration for crime, compulsory appearance in court, fire, flood, pestilence, war, and other catastrophes, and there is nothing in the constitutions to gainsay this.

Durational residence requirements—whatever that term in law may ultimately come to mean—presently must be read to mean a fixed minimum term prescribed by law. Thus, the declaration in *Dunn v. Blumstein, supra,* and one necessarily now adopted by this court, that "Durational residence requirements completely bar from voting all residents not meeting the fixed durational standards," either declares another palpable truism, or it means that a state may not impose any *fixed* or minimum time for the right to vote—certainly a most curious and remarkable idea. Any citizen of the United States, according to the two cases, thus becomes a citizen and elector of any state wherein he may happen to travel simply by declaring his intent to live there at the moment of arrival. Any period of residence whatever would amount to a fixed durational period according to the *Dunn* and *Moen* rationale, and if prescribed as a condition of state suffrage would work an unconstitutional bar upon the right to vote—or stand for public office, or serve as a juror, or sponsor and sign initiatives, referenda and recall petitions. Under the aegis of these two cases, future generations of electors will witness the most traveled, traveling and itinerant politicians and political activists ever known to this republic.

The right to travel among the states has, of course, long been deemed an attribute of citizenship. Thus, for example, when the State of Nevada sought to impose a special tax upon common carriers on every passenger carried out of the state, the tax was held unconstitutional in part as an abridgment of the rights of national citizenship. *Crandall v. Nevada,* 73 U.S. (6 Wall.) 35, 18 L. Ed. 745 (1867). Similarly, it was held to be an unconstitutional interference

with interstate commerce for the State of California to impose penalties against anyone who brought or assisted in bringing indigent persons into the state. *Edwards v. California*, 314 U.S. 160, 86 L. Ed. 119, 62 S. Ct. 164 (1941). But in those cases, the challenged legislation laid a direct and undeniable burden upon travel into, through and out of the states.

Perhaps the most direct burden laid by law upon the privilege of traveling is found in the United States Supreme Court rules. Under U.S. S. Ct. R. 52(d), the applicant must pay an admission fee of $25 and be able to demonstrate to the court that his "private and professional [character] shall appear to be good" (U.S. S. Ct. R. 5); and swear to demean himself before the court "uprightly, and according to law." U.S. S. Ct. R. 5. Further, before one can travel to the District of Columbia for the purpose of practicing before the Supreme Court of the United States, he must, according to rule 5, present certain certified documentation to the clerk of that court, endorsed by two members of the bar of that court not related to him, and certify further that he has been admitted to practice before the highest court of a state for at least 3 years.

If travel is to be the touchstone of constitutionality, there is scarcely a major legislative enactment which cannot in one degree or another be said to be affected by it. Never, until now, has one's inclination, capability of or capacity for traveling been asserted as a basis for holding unconstitutional not only a statute but a constitutional provision as well.

*Dunn v. Blumstein, supra,* seems to rest, too, on an idea other than freedom of travel. A part of the ratio decidendi includes the idea that the requirement of a year's residence is unreasonable and ipso facto unconstitutional because, with the flowering of the age of the computer, residence requirements are superfluous and impose unnecessary and, therefore, unconstitutional restrictions upon American citizens as they move from one state to the other. Thus, *Dunn v. Blumstein, supra,* based as it is on the proposition that

computerization is the constitutional equivalent for time, puts the states under an obligation to computerize their electoral system. We now see the emergence of a new constitutional doctrine, or what might be aptly termed the chameleon principle: an ever-changing constitution as dominated by an ever-changing technological environment.

That the people in their considered judgment have set forth in their constitution and statutes a 1-year residence requirement to assure honest voting, avoid multiple balloting, and provide some assurance that the registrant has decided to cast his future with the state, appears now to be of no consequence. It seems to me, however, that the mode and manner of registering voters and conducting elections are matters exclusively for the determination of the Congress and the legislatures, and that so long as the statutes are applied fairly and equally to all qualified persons the courts should have little to say about the subject. One thing at least is certain, and that is that the judiciary has no authority whatever to substitute its judgment for that of the people's representatives as to the means and methods for holding honest, unrigged elections, or to ordain that the 50 states must computerize or risk having their elections judicially voided. In showing such sublime faith in the efficacy of the computer, it would seem that neither court has heard of the basic, inherent limitation which bedevils the computer, one expressed in the acronym GIGO—garbage in, garbage out. To that characterization, I think, should now be added FIFO—fraud in, fraud out.

And, in computerizing the electoral process, who is to be responsible for honest elections if it transpires that the state has neither the money nor the equipment available for computerization? Who is to assume the final responsibility for guaranteeing honest registration, honest voting, absolute secrecy, honest count, and preservation of the ballots for ultimate comparison in case of a challenge? Under *Dunn,* one may travel primarily for the purpose of voting. But who will determine the bona fides, for example, where a resident of San Francisco, voting in a fall election, claims

to be a bona fide resident of Palm Springs in time to vote there in the spring election, and later in the Oregon presidential primary, and then the next succeeding general election in Washington, or to run for public office in each jurisdiction? After all, only a short period of residence under the two cases is essential to state citizenship in either of these jurisdictions when coupled with a statement that the applicant lived in the voting district for 60 days prior to registration and intends to live there. Do the courts now envision a national computer system, keyed to the systems of the 50 states, in which every voter must be photographed, fingerprinted and documented so that the states may rely upon the assurance of their local computers that the voter or candidate is a resident of only one state at a time?

Thus, to throw out the provisions of the Tennessee constitution as it pertains to voting qualifications because they interfered with Mr. Blumstein's right to travel, entailed reliance on an assumption belied by the facts of that case and clearly pointed out in Mr. Chief Justice Burger's dissent. A majority of the justices of both courts appear to believe that computerizing the election and registration process will provide a better system than the present one, yet both courts fail to point out from where, circa 1972, the money for computerization is to come. Nor do the courts demonstrate how and in what way the comparatively short residence period, when augmented by an electronic recording device, is a superior check on fraud and deception than that of a substantial period of open and identifiable residence supported by an oath of residence and citizenship, coupled with a verifiable history of the elector's former residence.

Neither the Constitution of the United States nor the Constitution of the State of Washington permits, nor do the practical necessities of self-government justify a departure from the general principles set forth in 25 Am. Jur. 2d *Elections* § 58 (1966):

The right to vote may be dependent on the existence of

certain conditions or on compliance with prescribed requirements, and such conditions and qualifications vary, of course, with the constitutions or laws of the several states.

That the states may specify the qualifications for voters in both state and federal elections is implicit in the Federal Constitution. Article I, § 2, and the Seventeenth Amendment provide that in elections of United States Representatives and Senators, the electors of each state shall have the qualifications requisite for electors of the most numerous branch of that state's legislature. Traditionally, these provisions establish the basis for the proposition that the states alone possess the right to establish qualifications for voting. And there is no doubt that, historically, the states have exercised exclusive authority to fix the qualifications of voters. The states have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised, not only with respect to elections of local officers, but also with respect to elections of presidential electors, absent, of course, the discrimination the Constitution condemns. The qualifications of voters are fixed by state constitutions and statutes, and territorial legislatures have the power to prescribe any reasonable qualifications of voters not inconsistent with the limitations of the United States statutes.

The courts, before proceeding further on this portended course of interpreting the constitution according to the travel principle, should first take another look at the situation, circa 1972, to which the application of a philosophy of unrestrained and, I think, irresponsible judicial interpretation applied in other spheres of government has brought us.

The criminal law is now an unchartered morass. In this country, there are literally thousands of individuals in prison or at liberty on parole or probation whose judgments of conviction have never, even in the course of years, become final and whose cases are allowed to drag on interminably through the judicial systems. Authority over penal institutions has been wrested by the courts from the lawfully elected or appointed officials of the executive branch

charged by law and responsible to the people for administering our penal institutions. In the field of public education, the courts have handed down decisions intended not only to assure each child the equal protection of the laws but they have gone far outside the judicial sphere of competence, abusing the judicial power, I think, to engage in active management of school affairs.

And even more glaringly in an example of what I fear to be a breakdown in the administration of the laws and government according to the constitutions, but part and parcel of this judicial hyperactivity on the one hand and somnolence on the other, is the Vietnam war now raging in Southeast Asia—an example of the most far-reaching and tragic consequences of government's failure to hew to the lines drawn by the nation's constitution. For nearly 10 years—depending on how the date of initial hostilities is assessed—this nation has been fighting a war in which it has committed to battle millions of men and vast supplies of material without any exercise by the Congress of its exclusive power under the United States Constitution article 1, section 8, to declare war. Now with more than 50,000 Americans dead and hundreds of thousands of Americans wounded, the war drags on at a never-ending cost in blood and treasure in a conflict carried out under the war-waging powers of several presidents as commanders-in-chief, but as I see it in derogation of those powers to declare war vested exclusively in Congress by the Constitution of the United States. It is not inconceivable that all in all we are witnessing what could be the twilight of constitutional government.

And the courts have, I fear, assumed extraconstitutional powers in the field of elections, usurping the functions of the legislature, or the people acting directly by initiative or referendum, in what has been long regarded as a purely political function of government—a function reserved exclusively by the constitution to the people or their elected representatives. Not content with limiting the judicial function to that prescribed by the constitution, declaring

unconstitutional redistricting and apportionment statutes, the courts have proceeded, I think, in excess of their powers to legislate new ones as well—all the while in many cases retaining jurisdiction long after jurisdiction under the constitution has ceased. Evading the normal restraints thought to inhere in the judiciary both by tradition and by the constitutions, we see the courts now not only discharging the judicial function of determining the constitutionality of legislative districting and apportionment laws under the Fourteenth Amendment but going far beyond their constitutional authority to essay into the political arena, performing political functions by judicially redrafting and defining congressional districts, altering the numerical composition of state legislatures, promulgating new electoral laws, establishing the size and redefining the boundaries of state legislative districts. One can search the Constitution of the United States and those of the 50 states and find not a word or phrase warranting such expansive and overriding employment of judicial power.

This court's instant opinion and *Dunn v. Blumstein,* 405 U.S. 330, 31 L. Ed. 2d 274, 92 S. Ct. 995 (1972), thus not only repealed the constitutions of Tennessee and Washington as they relate to the 1-year residence requirement for voting but additionally legislated new constitutional provisions for the people of Tennessee and Washington. In adopting this new constitutional provision, the courts have made a poor exchange, in my opinion, promulgating provisions less lucid than the ones the people of Tennessee and Washington already had. The two cases convey the idea that residence of 30 days or of some other indefinite period shall constitute the residence requirement for Tennessee and Washington citizenship, and that 30-days residence or thereabouts gives one the right to vote in the state—and, by necessary implication, to run for public office or serve as a juror, or grand juror, or, as the court I feel is bound to rule, attend the state university without paying out-of-state tuition,[2] or

---

[2]*Kirk v. Board of Regents,* 273 Cal. App. 2d 430, 78 Cal. Rptr. 260 (1969), *appeal dismissed* for want of a substantial federal question, 396

enjoy the many other rights concomitant to state residence in Tennessee and Washington not enjoyed by residents of the other 48 states.

Announcing, as the two cases do, a principle that a state has no constitutional power to fix a longer period of residence than computerization will conveniently allow, there arises from them a further implication that no government can impose any inconvenience upon its citizens that a computer can be said to obviate. Implicit in this rationale is the concept that the judges know what is best for the people, and that there reposes in the judiciary a superior wisdom of such overriding power that the constitutions must be read in the light of that superior wisdom. This court must now be prepared to hold that it overlooked the travel-impairing features of the state constitution and the blessings of computerization when, under the state constitution, it held that state offices had to be removed to and located at the seat of government in Olympia. Its decision in *State ex rel. Lemon v. Langlie*, 45 Wn.2d 82, 273 P.2d 464 (1954), returning the state's offices and those who staffed them to the seat of government obviously placed a greater and more direct burden on travel than does the state's 1-year residence requirement.

There were many reasons for requiring a year's residence for state suffrage, and providing some assurance of honest elections was but one of them. That is what the election and registration laws are all about—not travel—but honest registration and honest voting and reasonably inexpensive elections and a reasonable indication of state citizenship. Here is precisely what the Constitution of the State of Washington states about residence. It says nothing about

U.S. 554, 24 L. Ed. 2d 747, 90 S. Ct. 754 (1970), upheld the higher nonresident tuition fee exacted from a person who had not resided in California for 1 year. Similarly, *Starns v. Malkerson*, 326 F. Supp. 234, *aff'd mem.*, 401 U.S. 985, 28 L. Ed. 2d 527, 91 S. Ct. 1231 (1971), sustained the University of Minnesota's 1-year residency requirement where the nonresident tuition rate was more than twice that paid by residents of the state. Both of these holdings obviously interfere more directly with travel than do the residence requirements for voting.

travel, technological advancement or the right freely to enter and leave the state:

> All persons of the age of twenty-one years or over, possessing the following qualifications, shall be entitled to vote at all elections: They shall be citizens of the United States; they shall have lived in the state one year, and in the county ninety days, and in the city, town, ward or precinct thirty days immediately preceding the election at which they offer to vote . . .

Const. art. 6, § 1.

That provision, as was Tennessee's in *Dunn v. Blumstein, supra,* shows no conflict whatever that I can find with the Constitution of the United States as originally adopted nor with its many amendments, including the Fourteenth. But the state constitution is buttressed with an additional support; it is fortified with a strong judicial presumption of constitutionality. Thus, the presumption that a statute is constitutional and will not be declared invalid unless its repugnancy to the constitution appears beyond reasonable doubt (*Markham Advertising Co. v. State,* 73 Wn.2d 405, 439 P.2d 248 (1968); *State ex rel. Smilanich v. McCollum,* 62 Wn.2d 602, 384 P.2d 358 (1963); *Clark v. Dwyer,* 56 Wn.2d 425, 353 P.2d 941 (1960)), applies from the very nature of things with greater force to a constitution than to a statute. But even without this presumption, where is there, in either the Tennessee case or in this one, the slightest basis for a conclusion that the above constitutional provision is repugnant to the federal constitution, much less that such repugnancy appears beyond reasonable doubt? It takes a phantom principle like freedom to travel, or computerization of elections, or some other equally fanciful conjuration, to create any doubt whatever, much less a conclusion beyond a reasonable doubt, that the state's constitution is unconstitutional.

But there were other reasons besides reducing election frauds for the constitutional provision now declared invalid and the implementing registration and election statutes: They were designed not only to curtail duplicative voting

and other kinds of misconduct, but were obviously intended to foster the development of an affinity between the participant in public affairs and the state itself. The constitution contemplates thus that state citizenship, as well as American citizenship, should not be casual or perfunctory; that the voter or candidate have more than a casual or perfunctory connection with the state; and that he be encouraged to identify with and attain some degree of familiarity with the state and its political institutions. That is partly why the Fourteenth Amendment declares that a citizen of the United States is a citizen of the state wherein he resides. And that is among the reasons why our state constitution, adopted long after the Fourteenth Amendment, contemplates that one convincingly demonstrate he resides here by showing he has lived here for a year. The constitutional provision was thus designed to put some kind of a damper on political carpetbaggery, to discourage those passing through, or sojourning briefly here, or who come here primarily for the purpose of engaging in politics, from assuming the full power of citizenship until they had demonstrated an intention to stay a while and take part in the political life of the state.

I think it repugnant to our political institutions that one can enter this state, stay here a comparatively few weeks, claim state suffrage on the basis of this short stay, and then proceed, as soon as registered, to vote, run for office, instigate recall, referendum and initiative petitions, sit as a juror, enter our state supported colleges and universities on the same financial basis as those who have with their taxes built and maintained them, and exercise all of the other attributes of state citizenship.

Voting, as an attribute of citizenship, is a product of the federal and state constitutions. The state constitution adopted under the federal constitution and enabling legislation of the Congress directs the legislature, not the judiciary, to enact registration laws and to enforce their compliance. Const. art. 6, § 7. It says that voting shall be by ballot and conducted in such a manner that the voter may be

assured "absolute secrecy in preparing and depositing his ballot." Const. art. 6, § 6. Both decisions, *Dunn* and the present one, I think, are repugnant to the well-established principles that the Fourteenth Amendment does not prohibit the states from exercising wide discretion among citizens—a principle specifically stated in *McGowan v. Maryland,* 366 U.S. 420, 425, 6 L. Ed. 2d 393, 81 S. Ct. 1101 (1961):

> Although no precise formula has been developed, the Court has held that the Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it. See *Kotch* v. *Board of River Port Pilot Comm'rs,* 330 U. S. 552; *Metropolitan Casualty Ins. Co.* v. *Brownell,* 294 U. S. 580; *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61; *Atchison, T. & S. F. R. Co.* v. *Matthews,* 174 U. S. 96.

We should note now that the federal constitution also speaks directly to the qualifications for elections, and that in doing so it places responsibility for establishing and enforcing such qualifications upon the states. The federal constitution declares that the states must prescribe the qualifications for voting for members of Congress; that these qualifications shall be the same as those prescribed by the states for election to the state house of representatives, or, as it is described, the most numerous branch of the state legislature:

> The house of representatives shall be composed of members chosen every second year by the people of the several states, and the electors in each state shall have the qualifications requisite for electors of the most numerous branch of the state legislature.

U.S. Const. art. 1, § 2. *Dunn v. Blumstein,* 405 U.S. 330,

31 L. Ed. 2d 274, 92 S. Ct. 995 (1972), makes no reference to this provision.

This provision presumably puts a crimp on travel for it precludes itinerants from moving from state to state with election to Congress in mind. Adopted as it was prior to the Fourteenth Amendment, article 1, section 2, fixing the qualifications for electors of and candidates for Congress presents a new problem. Will it now be held that the overriding right to travel, as affecting the Fourteenth Amendment and the original constitution, means that one can qualify for election to Congress on the same basis that he can now qualify to vote? Is it now to be held under the *Dunn* rationale that article 1, section 2, requiring members of Congress to be residents of the state from which they have been elected has been amended or abridged by the Fourteenth Amendment interpreted according to the travel principle?

The decisions create an enigma, too, with respect to the election of United States senators. At the outset, and until 1900, senators were chosen not by the people qualified by state law to act as electors, but by the state legislature:

> The senate of the United States shall be composed of two senators from each state, chosen by the legislature thereof, for six years; and each senator shall have one vote.

U.S. Const. art. 1, § 3.

In 1913, long after the Fourteenth Amendment had been adopted, came the Seventeenth Amendment affirming in the people of each state the power to prescribe the qualifications for voting for United States senator:

> The senate of the United States shall be composed of two senators from each state, elected by the people thereof, for six years; and each senator shall have one vote. The electors in each state shall have the qualifications requisite for electors of the most numerous branch of the state legislatures.

U.S. Const. amend. 17.

Apparently, since the electors "of the most numerous

branch" under the present decisions need only be in the state a short while, they may at the time of registering to vote become eligible for elections to the United States Senate.

The people, although dealing several times in their constitution with voting, have not seen fit to write a travel amendment. In adopting the poll tax amendment, the Twenty-Fourth Amendment to the United States Constitution, a provision having to do with voting, the people made no mention of travel rights. While making the poll tax unconstitutional in elections for president, vice-president, senator or representative, they failed to add or include in the amendment any provision affecting the ultimate power of the states to prescribe the qualifications of electors or to protect the right to travel.[3] Similarly, in the Twenty-Third Amendment, giving citizens of the District of Columbia the right to vote for president and vice-president and to have their votes count, there is a singular silence as to the qualification for voting in or traveling among the states of the union.[4]

The only reference to freedom of travel in the federal

---

[3] U.S. Const. amend. 24: "§ 1 . . . The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax.

"§ 2. The Congress shall have power to enforce this article by appropriate legislation."

[4] U.S. Const. amend. 23: "§ 1 . . . The District constituting the seat of Government of the United States shall appoint in such manner as the Congress may direct:

"A number of electors of President and Vice President equal to the whole number of Senators and Representatives in Congress to which the District would be entitled if it were a State, but in no event more than the least populous State; they shall be in addition to those appointed by the States, but they shall be considered, for the purposes of the election of President and Vice President, to be electors appointed by a State; and they shall meet in the District and perform such duties as provided by the twelfth article of amendment.

"§ 2 . . . The Congress shall have power to enforce this article by appropriate legislation."

constitution is the same article which places upon the state legislatures the power and duty of holding elections. Article 1, section 4, says that the "times, places and manner of holding elections for senators and representatives, shall be prescribed in each state by the legislature thereof," and is singularly silent as to any power in the judiciary to prescribe any conditions whatever. Section 6 of that same article adds that senators and representatives "shall in all cases, except treason, felony and breach of the peace, be privileged from arrest during their attendance at the session of their respective houses, and in going to and returning from the same."

Nowhere in the federal constitution can one find a power, express or implied, to abrogate a state constitution which fixes 1 year as the period of residence for state citizenship; nor can one find any basis, direct or indirect, for an assumption that qualifications for suffrage have anything whatever to do with travel.

That the people of this state in the exercise of their sovereignty have given careful and continuous attention to the very voting requirements now ousted by this court and the United States Supreme Court will be seen in the earlier constitutional provision dealing with the precise subject. This state entered the union with a 1-year residence requirement in accordance with the Enabling Act of 1889 (25 Stat., ch. 180, p. 676), long after the adoption of the Fourteenth Amendment to the federal constitution. With the Fourteenth Amendment in existence for 20 years, there was no reason whatever to assume in 1889 that travel would one day be the vehicle for depriving the people of this and the other states of one of their fundamental rights of self-government—the right to fix reasonable minimum standards of residence for state suffrage, or that a 1-year residence requirement would be unconstitutional. The Enabling Act, expressly affirming the proposition that the people of the territory and not their judges were to decide the qualifications of voting and citizenship, says:

That all persons who are qualified by the laws of said

Territories to vote for representatives to the legislative assemblies thereof, are hereby authorized to vote for and choose delegates to form conventions in said proposed States; and the qualifications for delegates to such conventions shall be such as by the laws of said Territories respectively persons are required to possess to be eligible to the legislative assemblies thereof; . . .

Enabling Act, § 3.

The original constitution adopted by the people of the Washington Territory 21 years after adoption of the Fourteenth Amendment, in seeking admission to the union and necessarily meeting the conditions for statehood prescribed by the Congress in 1889, contained a clear and definitive statement that the right to vote depended upon (1) male United States citizenship; (2) residence in the state 1 year; (3) residence in the county 90 days; and (4) residence in a city, town, ward or precinct 30 days preceding the election. Const. art. 6, § 1. Seven years later, in 1896, the people amended this provision adopting the Second Amendment to the state constitution which, while retaining the discriminatory clause against women, added the explicit requirement that all voters must be able to read and speak the English language. Then, in 1910, by Amendment Five, the people again spoke on this subject, eliminating discrimination against women, but retaining the residence requirement for citizenship.

Thus, throughout the 83 years since 1889, a state constitution which has declared that "All persons of the age of twenty-one years or over, possessing the following qualifications, shall be entitled to vote at all elections: They shall be citizens of the United States; they shall have lived in the state one year, and in the county ninety days, and in the city, town, ward or precinct thirty days immediately preceding the election at which they offer to vote" (article 6, section 1), has not been doubted as an exercise of popular sovereignty; it has been not only countenanced but expressly ordained by the federal constitution.

The people have given a good deal more attention to

voting requirements than can be found in the current spate of judicial opinion on the subject and have, in my judgment, expressed their views with far greater clarity. As it relates to voting, the state constitution speaks only tangentially of travel in provisions now ignored by this court:

§ 4 . . . For the purpose of voting and eligibility to office no person shall be deemed to have gained a residence by reason of his presence or lost it by reason of his absence, while in the civil or military service of the state or of the United States, nor while a student at any institution of learning, nor while kept at public expense at any poor-house or other asylum, nor while confined in public prison, nor while engaged in the navigation of the waters of this state or of the United States, or of the high seas.

§ 5 . . . Voters shall in all cases except treason, felony, and breach of the peace be privileged from arrest during their attendance at elections and in going to, and returning therefrom. No elector shall be required to do military duty on the day of any election except in time of war or public danger.

Const. art. 6, §§ 4, 5.

Curiously, there is nothing in the foregoing provision which purports to abrogate or abridge the 1-year residence requirement.

It is a dangerous expedient to ignore the constitution even to attain what is thought to be a desired end. The assertion of power to do it in one case imports a claim of power to do the same in all other cases and whenever the judiciary feels inclined to do so. The guarantees of individual liberty proclaimed in the Fourth and Fifth Amendments specifying that it is the people who shall be secure in their persons, houses, papers and effects against unreasonable searches and seizures, and which declares that no person shall be deprived of life, liberty or property without due process of law, or suffer double jeopardy or compulsory self-incrimination, may be as readily rewritten by the courts under the same claim of power as the constitutional provision respecting the qualifications for voting.

The constitutions have always recognized the implication of state citizenship. The Eleventh Amendment employs the term "citizens" in referring to suits by citizens of one state against another sovereign state; the Fourteenth Amendment prohibits a state from abridging the privileges and immunities of United States *citizens* or from depriving any *persons* of equal protection of the laws or due process of law. And the Nineteenth Amendment states that the right of *citizens* to vote shall not be denied or abridged by either the United States or any state on account of sex. From these specific references to citizenship rights in the Constitution of the United States, it should be clear that the states, in prescribing a reasonable but precise minimum period of residence as among the qualifications for state suffrage, are complying with both the letter and the spirit of the national constitution. Neither Tennessee nor Washington deprived plaintiffs in either case of due process of law or the equal protection afforded by law to all who would become residents, citizens, or electors of either Tennessee or Washington.

One may be a citizen of the United States and yet not a citizen of any state, for "an important element is necessary to convert the former into the latter. He must reside within the State to make him a citizen of it, but it is only necessary that he should be born or naturalized in the United States to be a citizen of the Union. It is quite clear, then, that there is a citizenship of the United States, and a citizenship of a State, which are distinct from each other . . ." *Slaughter-House Cases,* 83 U.S. (16 Wall.) 36, 74, 21 L. Ed. 394 (1873). Thus, the Fourteenth Amendment, in declaring that "All persons born or naturalized in the United States . . . are citizens of the United States and of the state wherein they reside," means that one cannot be a citizen of more than one state at the same time, and every state may require residence within the state as a basic ingredient of state citizenship.

The Supreme Court of the United States and now this court make light of state interests in maintaining the quali-

fications for state suffrage, holding that the state has no substantial and compelling reasons for imposing what are described as unreasonable durational residence requirements. Aside from the obvious redundancy of this proposition—for if a reason is compelling, it is substantial, and most likely vice versa—common sense as well as the constitutions dictate that, if the state's requirements are not excessive, and if they comport with reason so as not to impose undue burdens upon citizens of the United States, residence requirements of a fixed term do not deny but rather foster equal protection of the laws.

It is, therefore, not a denial of the protection of the laws for one state to deny the citizens of another state to vote in its election, or to stand for public office there, or to serve as a juror, or grand juror, or foster and sign initiative, referendum and recall petitions, or attend a state institution of higher learning at the same rate of tuition available to citizens of the state which erected and maintain the university. As the Supreme Court has stated,

> *Carrington* v. *Rash,* 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965), dealt with a similar situation. There we recognized that Texas had a powerful interest in restricting its electorate to bona fide residents. It was not disputed that most servicemen stationed in Texas had no intention of remaining in the State; most therefore could be deprived of a vote in state affairs.

*Stanley v. Illinois,* 405 U.S. 645, 655, 31 L. Ed. 2d 551, 92 S. Ct. 1208, 1214 (1972). The principle then that courts should not seek out conflicts between state and federal regulations where none clearly exist (*Seagram & Sons, Inc. v. Hostetter,* 384 U.S. 35, 45, 16 L. Ed. 2d 336, 86 S. Ct. 1254 (1966)), ought to be the controlling rule in this and the Tennessee case. To employ the supremacy clause of the federal constitution so as to render void a state's regulation of its internal affairs is not only disfavored but unwarranted when based on pure assumption drawn from the facts of coincident legislation. As was said in *Penn Dairies, Inc. v. Milk Control Comm'n,* 318 U.S. 261, 275, 87 L. Ed. 748, 63 S. Ct. 617 (1943):

An unexpressed purpose of Congress to set aside statutes of the states regulating their internal affairs is not lightly to be inferred and ought not to be implied where the legislative command, read in the light of its history, remains ambiguous. Considerations which lead us not to favor repeal of statutes by implication, *United States* v. *Borden Co.*, 308 U. S. 188, 198-9; *United States* v. *Jackson*, 302 U. S. 628, 631; *Posadas* v. *National City Bank*, 296 U. S. 497, 503-5, should be at least as persuasive when the question is one of the nullification of state power by Congressional legislation.

The test of viability of both constitutions, when placed side by side, is whether both sovereigns can operate within the area of the field of regulations, and in a case such as this whether the national constitution preempts the field. When applied to acts of Congress, vis-a-vis state legislatures, the question is whether the area of legislation is subject to federal preemption under the constitution. If it is an area subject to federal preemption but there is no expressed intent by Congress to preempt, the determinative question is, Can both federal and state regulations be enforced without impairing federal superintendence? *Head v. New Mexico Bd. of Examiners in Optometry*, 374 U.S. 424, 10 L. Ed. 2d 983, 83 S. Ct. 1759 (1963). In the area of written constitutions, as distinguished from statutory law, the same principles apply. These provisions, now found to be in conflict, have operated in near perfect harmony, side by side, throughout the union for more than a century.

It was not given to either the federal or state judges to prescribe qualifications for state or national citizenship nor to require the people to computerize their government. Those are matters exclusively reserved by constitutions to the constitution proper, to the Congress, and to the state legislatures. So long as the conditions for proving state residence established by the states do not unreasonably deny state suffrage to all citizens of the United States seeking it, and apply equally to all persons without regard to race, religion or economic status, the judges, I think, should be and are without power to set the standards aside, much

less prepare and promulgate a set of judicial standards in lieu of those set forth in a state constitution or adopted by the state legislature.

The constitution, of course, is not to be interpreted according to the boon thought to be conferred by the computer—a contrivance regarded in some quarters as a mixed blessing—nor does the constitution acquire a new and different meaning every time a new mechanical or electrical contrivance comes upon the scene. The right to trial by jury, for example, could not be abrogated if a majority of the judges in a given case concluded that juries are apt to be prejudiced or biased and that a computer will do their work more efficiently, at less cost, and without such bias or prejudice. Nor would I welcome a comparison between judges and computer on the same basis.

From a purely practical standpoint, and aside from the unconstitutional assertion of judicial power earlier described, I think the people of the state of Washington and of the state of Tennessee have adopted sets of standards and qualifications for voting which are superior in every respect to those promulgated in *Dunn v. Blumstein*, 405 U.S. 330, 31 L. Ed. 2d 274, 92 S. Ct. 995 (1972), and now by this court, and that there is nothing whatever about them repugnant to the Constitution of the United States.