W. R. "Squibb" WILSON et al.,
Plaintiffs,

v.

Arch A. MOORE, Jr., Governor of the State of West Virginia, et al.,
Defendants.

Civ. A. No. 72-6-F.

United States District Court,
N. D. West Virginia.
Fairmont Division.

July 24, 1972.

James H. Cheek, III, Nashville, Tenn., Ross Maruka, Fairmont, W. Va., for plaintiffs.

Chauncey H. Browning, Jr., Atty. Gen., Victor A. Barone and Thomas P. O'Brien, Asst. Attys. Gen. of W. Va., Charleston, W. Va., for defendants.

Before FIELD, Circuit Judge, and MAXWELL and CHRISTIE, District Judges.

CHRISTIE, District Judge:

Following many years of public agitation and debate for a constitutional amendment to bar dual office-holding and eradicate conflicts of interest in the legislature of their state government, the voters of West Virginia, at the general election held November 3, 1970, ratified an amendment to that state's constitution, Art. VI, Sec. 13 (1 W.Va.Code 1971 Supp., p. 41), designated the "Legisla-

tive Improvement Amendment," which provided that,

"No person holding any other lucrative office or employment under this State, the United States, or any foreign government; no member of Congress; and no person who is sheriff, constable, or clerk of any court of record, shall be eligible to a seat in the legislature."

Plaintiffs, in their individual capacity and as representatives of a class, challenge the constitutionality of this amendment alleging that it conflicts with certain provisions of the United States Constitution. A three-judge court was convened, pursuant to the provisions of 28 U.S.C. Sections 2281 and 2284, to resolve the issue and to accord plaintiffs appropriate relief in the event the amendment is determined to be in conflict with any provision of the United States Constitution. The parties have chosen to submit the case to the court on the basis of a stipulation containing an agreement with regard to certain facts and admitting various exhibits which are to be considered as parts of the record before the court in reaching a decision.

## PARTIES

Plaintiff Wilson is a resident of Marion County, West Virginia, and is currently employed as Athletic Director of Fairmont State College, Fairmont, West Virginia. He sues on behalf of himself and as representative of a class consisting of all persons who hold, or will hold, lucrative employment under the West Virginia State Government, and who presently desire, or will in the future desire, to engage in political activities by seeking and holding public office as a delegate to the West Virginia House of Delegates. Plaintiffs Helen L. Bickel, Paul V. Yost, Robert H. Tennant, and James E. Sago are residents of Marion County, West Virginia, and are qualified and registered to vote in primary and general elections for local, state, and national office. These plaintiffs sue on behalf of themselves and as representative

of a class consisting of duly qualified and registered voters in Marion County, West Virginia, who voted in the general election held on November 3, 1970, for Wilson to represent them as a delegate to the House of Delegates from that county, and who presently desire, or will in the future desire, to engage in political activity by exercising their right of franchise by voting for a person holding lucrative employment under the State to represent them as a delegate to the House of Delegates.

Defendant Arch A. Moore, Jr., is Governor of the State of West Virginia and as such, under the constitution of that State, is charged with the general duties of enforcing the laws of the United States and the State of West Virginia. Defendant Chauncey H. Browning, Jr., is the Attorney General of the State of West Virginia and as such is the chief legal officer of the State. The charges against the numerous other defendants, all holding some position or office in state government, are made against them as representatives of various classes, such classes including the West Virginia House of Delegates and the Committee on Rules of the West Virginia House of Delegates.

## FACTUAL BACKGROUND

In the same general election in which the amendment at issue was ratified by the voters of West Virginia, Wilson was elected by the voters of Marion County to represent them in the West Virginia House of Delegates. At the time of his election, and continuing to the present date, Wilson was employed as Athletic Director of Fairmont State College, a state supported institution of higher education under the control and management of the West Virginia Board of Regents. Prior to taking the oath of office as a delegate to the West Virginia Legislature, Wilson's qualification to take his seat as a member of the House of Delegates was challenged as being in conflict with said recently enacted amendment. The challenge was referred to the Committee on Rules of the

House of Delegates. That Committee recommended the adoption of a resolution disqualifying Wilson on the basis of an opinion from the State Attorney General which concluded that he held lucrative state employment and was ineligible to take his seat in the House of Delegates, and that he could properly be excluded therefrom by a vote of that body. Thereafter, the West Virginia House of Delegates adopted the report of the Committee on Rules, including a resolution stating that Wilson was disqualified from holding a seat in the House of Delegates because of his state employment. As a consequence of this action, a vacancy was declared and the Governor appointed another to serve in Wilson's place for the remaining portion of his term.[1]

### CONSTITUTIONAL CHALLENGES

Plaintiffs challenge the validity of the amendment on numerous constitutional grounds, some seemingly overlapping and others somewhat vague; however, for the purpose of clarity, we believe it is possible to classify the imperfections raised in four categories:

(1) that the amendment is an abridgement of the First Amendment right of freedom of speech, freedom of assembly, and freedom to petition the government for redress of grievances, insofar as is applies to Wilson and the class which he represents;

(2) that the amendment deprives Wilson and the class he represents of liberty and property without due process of law in violation of the Fourteenth Amendment;

(3) that the amendment denies Wilson and the class he represents of the equal protection of the law in violation of the Fourteenth Amendment; and

(4) that the amendment deprives the plaintiffs Bickel, Yost, Tennant, and Sago, and the class they represent, of the equal protection of the law in violation of the Fourteenth Amendment.

Various other federal constitutional infringements are asserted by the plaintiffs, but they arise from, or are related to, the above-mentioned constitutional provisions and will be considered in connection therewith in the course of this opinion. Plaintiffs' counsel conceded in oral argument that they rely primarily upon the premise that the state amendment in question offends the First and Fourteenth Amendments to the Federal Constitution.

### APPLICABLE STANDARD OF REVIEW

■ ■ Before entering into a discussion of the substantive principles applicable to the issues before the court, consideration must be given to the standard to be applied in determining the constitutionality of the amendment, insofar as it is alleged to be in contravention of the First and Fourteenth Amendments to the Federal Constitution.[2] This issue arises as a consequence of the differing standards of review applied by the Supreme Court, depending on whether one is concerned with those cherished rights protected by the First Amendment, such as freedom of religion, speech, the press and assembly, where the slightest state infringement must be justified, or whether one is concerned with due process and equal protection questions arising under the Fourteenth Amendment where greater flexibility is sanctioned. In cases involving state ac-

---

1. In the recently held 1972 primary election, Wilson again was nominated by his party to represent it in the general election as a candidate for the West Virginia House of Delegates. Presumedly, in the absence of a favorable decision in this court, the House of Delegates will again refuse to seat him should he be successful in the general election.

2. As will be seen later in this opinion, we have concluded that there are no First Amendment questions involved; rather that the case must be considered and decided on the basis of the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment.

tion affecting fundamental rights arising under the First Amendment, the state has the burden of establishing a compelling state interest in order to justify any infringement. DeGregory v. Atty. Gen. of New Hampshire, 383 U.S. 825, 829, 86 S.Ct. 1148, 16 L.Ed.2d 292 (1966); Gibson v. Florida Legislative Investigation Comm., 372 U.S. 539, 549, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963); Bates v. Little Rock, 361 U.S. 516, 546, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960). However, in those cases in which the claim of infringement is based on alleged arbitrary or unequal treatment or invidious discrimination in violation of the Due Process Clause or the Equal Protection Clause of the Fourteenth Amendment, the courts have applied what has been described as the "traditional" or "rational basis" test in reviewing state action. Under this method of review, classification or discrimination between groups of citizens is permissible unless it is found to be devoid of any rational basis. Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911). This test and its implications were explained by the Court in McGowan v. Maryland, 366 U.S. 420, 425, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393, in the following manner:

"The standards under which this proposition [alleged violation of the Equal Protection Clause of the Fourteenth Amendment by Maryland's Sunday closing laws] is to be evaluated have been set forth many times by this Court. Although no precise formula has been developed, the Court has held that the Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objectives. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." [3]

■■■ The rationale of the traditional or rational basis test, as McGowan indicates, is that the states, in matters with which they, as opposed to the national government, are chiefly concerned, should be given some reasonable latitude in enacting legislation where its purpose is designed to eliminate a pernicious practice which has proved inimical to their general welfare.[4] Thus, a state enactment, or in this case the constitutional amendment, will not be struck down as violative of the Equal Protection Clause of the Fourteenth Amendment unless it is found to be obviously arbitrary and no conceivable factual situation can be found to justify the apparent unequal treatment it has created. McDonald v. Board of Election, 394 U.S. 802, 809, 89 S.Ct. 1404, 22 L.Ed.2d 739

3. The criteria for determining whether the state action infringes constitutionally protected rights, of course, will be the same whether the alleged infringement results from a legislative enactment or, as in this case, a constitutional provision adopted by the citizens of a state.

4. For example, in Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970), the Court applied the traditional or rational basis test as being consistent with the Equal Protection Clause of the Fourteenth Amendment, in the area of social welfare, in these words:

"In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality." . . . 'The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.' . . . 'A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.' "

(1969). A further consequence of the applicability of the traditional test is that the challengers (plaintiffs in this case) of the constitutionality of the amendment bear the burden of affirmative demonstration that in the actual state of facts which surround its operation, its classification lacks rationality. This is so because the amendment carries with it the presumption of constitutionality and reasonableness. McDonald v. Board of Election, supra; Borden's Farm Products Co. v. Baldwin, 293 U.S. 194, 55 S.Ct. 187, 79 L.Ed. 281 (1934); Salsburg v. Maryland, 346 U.S. 545, 74 S.Ct. 280, 98 L.Ed. 281 (1954); 16 Am.Jur.2d (Constitutional Law) Sec. 137, p. 338.

■ Moreover, the traditional or rational basis test is applicable in this case because the amendment in question neither infringes upon the protections afforded plaintiffs by the Bill of Rights nor upon their other fundamental rights or specially protected interests which, in other cases, has required the application of the more stringent "compelling interest" criteria. For, as we view it, the state amendment, by its terms, neither conditions the right to vote nor threatens disfranchisement; nor does it weigh or diminish the votes cast by some voters as compared with the weight accorded other votes cast for members of the West Virginia Legislature. The provision simply requires a successful candidate in an election to the West Virginia Legislature, who also holds a lucrative office of employment in state government, to make an election —whether to serve as a legislator and give up his state position or whether to retain his state position and thus fail to qualify for a seat in the legislature. So viewed, it is clear that the amendment imposes only an indirect burden on the candidacy of some West Virginia citizens—those holding lucrative state employment. Its impact on the voters obviously is peripheral and only incidental to the primary purpose the amendment is designed to achieve.

The Supreme Court noted very recently, in Bullock v. Carter (1972), 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92, that in determining whether to apply the traditional or the compelling interest test in reviewing state action under the Equal Protection Clause, a different problem is presented by the case in which conditions are imposed upon candidacy for an elective office from that presented in a case in which a condition or burden is placed on the exercise of the right to vote. It was there recognized that the "initial and direct impact" of conditions attached to candidacy for office is felt by the "aspirants" for office, requiring a more flexible standard of review, rather than on the "voters," where the application of a more stringent standard is called for. In the facts of that case, the Court found the rational basis test inappropriate because it was there determined that the filing fee system under attack "tends to deny some voters the opportunity to vote for a candidate of their choosing; at the same time it gives the affluent the power to place on the ballot their own names or the names of persons they favor." As a consequence, the Court concluded that the Texas filing fee system fell with unequal weight on candidates and voters according to their ability to pay, and thereby caused a real and appreciable impact on the exercise of the right of franchise—a fundamental right.[5] Under such circumstances, the Court felt the application of the more rigorous (compelling interest) standard of review was imperative to protect this fundamental right to vote; not to protect the right to be a candidate for, or to hold, public office. In contrast, the unequal treatment resulting from the pro-

---

5. In Smith v. Allwright, 321 U.S. 649, 661, 64 S.Ct. 757, 764, 88 L.Ed. 987 (1944), the Supreme Court enunciated that,
    "It may now be taken as a postulate that the right to vote in . . . a primary for the nomination of candidates without discrimination by the State, like the right to vote in a general election, is a right secured by the Constitution."

hibition in the amendment in question of dual office-holding in West Virginia does not directly or significantly affect the exercise of the franchise by West Virginia voters. Nor is the differing treatment related in any manner to the question of affluence or poverty or any other "suspect" classification of either voter or candidate. These facts clearly distinguish the instant case from the situation that confronted the Court in *Bullock*. We thus conclude that, in the light of the historical facts underpinning the amendment and the nature and reasonableness of the conditions imposed to achieve its objective, the amendment's application must be measured by the rational basis rather than the compelling interest test in determining whether or not it contravenes plaintiffs' constitutional rights. Having so determined, we shall now proceed to a consideration of the substantive principles applicable to the issues in the case.

## DEPRIVATION OF FIRST AMENDMENT RIGHTS

Plaintiffs assert that the right which they seek to establish in this action, the right to seek and hold public office, is the "ultimate embodiment" of the rights specifically enumerated in the First Amendment and, therefore, is entitled to the "ceaseless vigilance" of the courts by means of the compelling interest test to prevent encroachment by the Congress or by the States. See Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). As a part of the vigilant protection of First Amendment rights, plaintiffs urge this court to require the State of West Virginia, in order to sustain the validity of the amendment in controversy, to establish that the qualification for membership in its legislature is not only rational, but also reasonably necessary to accomplish a compelling state interest or objective. As we have noted above, insofar as we have been able to determine, the right to seek and hold state public office is not one of those rights included within the protection of the

First Amendment and, consequently, the commands of that Amendment are not applicable to this case. Rather, it is our belief that this is a case more appropriate for consideration within the context of the Fourteenth Amendment. Traditionally, as previously noted, the First Amendment has been applied to protect the "civil liberties" of the citizens, such as freedom of religion, speech, the press, and assembly, first against federal and later against state encroachment. These freedoms are so basic that their violation will not be countenanced except for the most cogent reasons, and the burden of showing justification for their violation, as we have already noted, is always on the violator. On the other hand, the protections afforded by the Fourteenth Amendment are generally more flexibly applied. They more appropriately relate to "civil rights," and the best illustration of these are the rights to seek and to hold public office free of invidious state erected discriminatory qualifications in contravention of the Due Process and Equal Protection Clauses of that Amendment. In the application of these protections, as we have seen, the traditional or rational basis test may be resorted to with the result that the burden of showing want of rationality in the action under attack rests upon the one asserting it. We are further persuaded of the correctness of our reasoning by the fact that the Supreme Court, although it has had numerous opportunities in recent decisions to declare the constitutional sanctity vis-a-vis the First Amendment of the right of a candidate to seek and hold state political office, has failed to accord such favorable status to this right.

In Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970), one of the questions discussed by the Court was whether Georgia's constitutional and statutory provisions requiring a member of a school board to be a "freeholder" violated the Equal Protection Clause of the Fourteenth Amendment. In this case, the Court not only failed to accord First Amendment status to the right to

seek and hold public office, but did, in fact, during the course of its opinion, recognize that a distinction exists between a condition or qualification for holding public office and a condition or qualification imposed upon the exercise of the right to vote, a right which admittedly is entitled to the protections accorded fundamental rights by the Constitution. Smith v. Allwright, supra, Footnote 5. Appellants in the *Fouche* case argued the applicability of the compelling interest test as applied by the Court in Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), and Cipriano v. City of Houma, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969). In reply, appellees argued that these two cases were not controlling because they involved exclusions from voting, not from holding office. The Court found it unnecessary to resolve this dispute, since, in its opinion, the Georgia freeholder requirement failed to meet even the requirements of the traditional test for determining whether or not there had been a denial of equal protection. During the course of its opinion in *Fouche*, 396 U.S. at p. 362, 90 S.Ct. at p. 541, the Court made the following remarks in which it mentioned the so-called right to public offices:

> "We find it unnecessary to resolve the dispute, because the Georgia freeholder requirement must fall even when measured by the traditional test for a denial of equal protection: whether the challenged classification rests on grounds wholly irrelevant to the achievement of a valid state objective.

> "*We may assume that the appellants have no right to be appointed to the Taliaferro County board of education.* But the appellants and the members of their class do have a federal constitutional right to be considered for public service without the burden of invidiously discriminatory disqualifications. The State may not deny to some the privilege of holding public office that it extends to others on the basis of distinctions that violate federal constitutional guarantees." (Emphasis added).

Thus, although the plaintiffs there were found to have a "federal constitutional right" to seek and be considered for public service, under the Equal Protection Clause of the Fourteenth Amendment, free of any invidiously discriminatory disqualifications, the Court did not go so far as to hold that they had a right, secured by the First Amendment, to seek and hold public office.

The *Bullock* case involved an even more direct and burdensome qualification for seeking public office. In that case, the State of Texas had imposed substantial filing fees, ranging as high as $8,900, on candidates seeking nomination in party primaries. However, the Court once again failed to accord the right to seek public office First Amendment protection and instead held that the filing fee requirements were unconstitutional under the Equal Protection Clause of the Fourteenth Amendment on the basis that they infringed upon the right to vote. While it is true that the Court applied the compelling interest test in reaching this result, nevertheless, it is clear from a careful reading of the opinion that the finding of unconstitutionality was based on the premise that the filing fee system discriminated against voters and, in fact, had a direct impact upon the right to vote. The fact that the Court recognized during the course of its opinion that it had not theretofore attached "fundamental status" to the right to seek public office is further evidence, at least by implication, that such right is not included within or protected by the provisions of the First Amendment.

The Supreme Court thus having failed to accord First Amendment status to the right to seek and hold public office, this court feels no compulsion, either with respect to principle or upon the basis of the particular facts of this case, to accord that status, as plaintiffs would urge, to the right of Wilson and the class he represents to seek and hold

office as members of the West Virginia Legislature. Nor do we find in the facts of this case any circumstance, or combination of circumstances, requiring us to apply the compelling interest test here, as the *Bullock* Court found it necessary to do under the facts of that case. Accordingly, insofar as plaintiffs seek to have the amendment at issue in this case declared unconstitutional on the basis of an alleged conflict with the provisions of the First Amendment, their claims must be denied.

## DENIAL OF LIBERTY OR PROPERTY WITHOUT DUE PROCESS OF LAW

Wilson next asserts that the denial to him of a seat in the West Virginia House of Delegates and the threat of disqualification to the class which he represents constitutes a denial of liberty and property by the State of West Virginia without due process of law, in violation of the Fourteenth Amendment. This raises the question of whether an elective post in state government constitutes such property or liberty as that protected by the Due Process Clause of the Fourteenth Amendment. This question has been answered rather emphatically by the Supreme Court, the most recent resolution thereof appearing in the Court's decision in Snowden v. Hughes, 321 U. S. 1, at p. 7, 64 S.Ct. 397, at p. 400, 88 L.Ed. 497, in which the following observations were made with regard to due process as it relates to state elective office:

> "More than forty years ago this Court determined that an unlawful denial by state action of a right to state political office is not a denial of a right of property or of liberty secured by the due process clause. Taylor and Marshall v. Beckham, 178 U.S. 548, [20 S.Ct. 1009, 44 L.Ed. 1187]. Only once since has this Court had occasion to consider the question and it then reaffirmed that conclusion, Cave v. [State of Missouri ex rel.] Newell, 246 U.S. 650, [38 S.Ct. 334, 62 L.Ed. 921,] as we reaffirm it now."

■ Our research having failed to unearth any subsequent holding by the Supreme Court contrary to its decision in *Snowden,* we must apply it as a viable precedent in this case. Accordingly, we find that since the provisions of the amendment at issue in this case meet the rationality test, as will be demonstrated later, they must be found not to deprive plaintiffs of their liberty or property in contravention of the Due Process Clause of the Fourteenth Amendment.

## DENIAL OF EQUAL PROTECTION OF THE LAW

### I. *Candidates*

■ The question presented with regard to the Equal Protection Clause of the Fourteenth Amendment is whether the State of West Virginia, by reason of the recently enacted amendment to its constitution prohibiting Wilson and the class he represents from qualifying to sit as members of the West Virginia Legislature while at the same time holding other lucrative public employment, has invidiously discriminated against those holding lucrative public employment by making it more onerous for them to seek and hold public office than for other citizens who are not so employed. As we have indicated, it is unquestioned that Wilson and the class he represents have the federal constitutional right to seek and hold public office free from any burden of invidious discrimination or classification under the Equal Protection Clause, the only question being whether the amendment at issue in this case generates such prohibited discrimination. In resolving this question, we must determine whether the distinctions or classifications with respect to which citizens may, and which citizens may not, serve in the West Virginia Legislature are obviously arbitrary and so patently without reason that "no conceivable situation of fact could be found to justify them." McGowan v. Maryland, 366 U.S. 420 at p. 535, 81 S.Ct. 1153 at p. 1194. As stated by the Court in Williams v. Rhodes, 393

U.S. 23, at p. 30, 89 S.Ct. 5, at p. 10, 21 L.Ed.2d 24 (1968):

"It is true that this Court has firmly established the principle that the Equal Protection Clause does not make every minor difference in the application of laws to different groups a violation of our Constitution. But we have also held many times that 'invidious' distinctions cannot be enacted without a violation of the Equal Protection Clause. In determining whether or not a state law violates the Equal Protection Clause, we must consider the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification."

▉ Reviewed under these principles, we find that the facts stipulated and the exhibits filed, constituting the evidentiary record in this case, clearly negative any arbitrary action by the legislature and citizenry of West Virginia in proposing and adopting the amendment under consideration. To the contrary, in our opinion, the evidence provides a solid foundation for such action in that it reveals that the practice of dual office-holding in their state government, with its attendant evils, had reached the point where it had seriously affected the objectivity, integrity, and efficiency of state public servants, which called for the taking of appropriate remedial measures to correct. It takes no great imagination for one to envision the potential harm inevitably to result to efficient and responsible government from the actions of a state employee who, as a legislator, is required to pass on bills affecting his own private interests or the particular branch or agency of government to which he belongs or by which he is employed. Such conflict, and the potential for harm inherent therein, indeed are very nearly unavoidable if public servants are permitted to serve the state in more than one capacity. The problem is not peculiar to West Virginia; it is widespread and is justly under attack by the people at all levels of government throughout the Nation. The means employed (constitutional amendment) to eliminate the practice from state government in West Virginia is consistent with the democratic process, is sanctioned by the common law, and is one which afforded free and open debate in the public forum. The regularity of the adoption of the amendment has not been brought into question in this case.

Moreover, we find the restraints imposed by the amendment to be in consonance with the ancient and well-established common law rule that a public officer cannot hold two incompatible offices at the same time. State ex rel. Thomas v. Wysong, 125 W.Va. 369, 24 S.E.2d 463 (1943); Dean v. Paolicelli, 194 Va. 219, 72 S.E.2d 506 (1952). This common law rule, at the present, has been refined and expanded by the constitutions and statutes of the great majority of the states. See generally 34 A.L.R.2d 155; 89 A.L.R.2d 632; 94 A.L.R.2d 557. Statutory and constitutional prohibitions include not only the holding of incompatible offices, but the holding of more than one public office or employment whether or not the offices held would be considered incompatible under the old common law rule. See generally 42 Am. Jur. (Public Officers) Sec. 58, et seq.

We find that the objective to be achieved is germane to enlightened representative state government, and that the classification arising therefrom has a rational basis in the fulfillment of that objective. The amendment provisions under attack, insofar as we can determine, do not offend per se the Equal Protection Clause of the Fourteenth Amendment to the Federal Constitution. They, therefore, must be upheld unless shown to be invidiously discriminatory in their operation. The burden of making such a showing, as previously indicated, is on the plaintiffs. They have failed to carry this burden. Consequently, we find no showing that Wilson's equal protection rights have been violated.

## II. *Voters*

With reference to the claim made that the amendment restricts the right to vote of those who would cast their ballots for candidates made ineligible to serve in the legislature because of state employment, it would seem sufficient to observe, as we previously have done, that the amendment does not prohibit any citizens, including state employees, from seeking public office; it restricts only the holding of incompatible public offices. Nor does the amendment burden or restrict in any manner the exercise of the franchise by the voters of the State of West Virginia. They too have a choice—to vote for a candidate not holding lucrative state employment or to vote for one holding such employment with the expectation that he will relinquish it in order to be seated. For these reasons, we find the argument of plaintiff-voters, with respect to the alleged deprivation of their constitutionally protected right to vote, to be unpersuasive. The argument raised relating to the purported overbreadth of the amendment, as is the assertion with regard to the status of the right to seek and hold public office vis-a-vis the Bill of Rights, is also found to be wholly lacking in merit under the circumstances of this case. See Dandridge v. Williams, 397 U.S. at p. 484, 90 S.Ct. 1153.

## CONCLUSION

It is, therefore, the opinion of this court that, for the reasons set forth in this opinion, the plaintiffs have failed to demonstrate that the Constitutional Amendment to Art. VI, Sec. 13, of the West Virginia Constitution, adopted November 3, 1970, is constitutionally invalid under any provision of the First Amendment or the Fourteenth Amendment of the Constitution of the United States. Nor do we find it to be in violation of any other provision, or provisions, of the Constitution of the United States. Having reached this conclusion, we, of course, would be unwarranted in making any judicial decree which would tend to frustrate an obviously noble and praiseworthy endeavor on the part of the citizenry of West Virginia to improve the machinery and operation of their state government.

Relief denied; action dismissed.