James C. HARPER, Plaintiff,

v.

Robert VANCE, as Chairman of the State Democratic Executive Committee of Alabama, and Mabel Amos, Secretary of State, Alabama, Defendants *.

Civ. A. No. 72-197.

United States District Court, N. D. Alabama, S. D.

April 21, 1972.

---

* By order of the Court, Mabel Amos, Secretary of State, has been dismissed from this suit. Nonetheless we retain, for convenience, the plural designation, "defendants".

George M. Higginbotham, Bessemer, Ala., for plaintiff.

Levine, Fulford & Pope, Birmingham, Ala., for defendants.

## OPINION AND ORDER

Before RIVES, Circuit Judge, and McFADDEN and POINTER, District Judges.

BY THE COURT:

In this case plaintiff Harper questions the constitutionality of that portion of the Alabama Democratic Party Executive Committee's Resolution adopted January 29, 1972, in which it is established that in order for an individual to become a candidate in the forthcoming Democratic primary he must first pay a qualifying fee to the Party.[1] The Resolution at issue was promulgated pursuant to Title 17, §§ 347 and 348 of the Code of Alabama.[2] Specifically, Harper contends that he desires to run for the United States Senate on the Democratic ticket and that he is unable to pay the $850.00 assessment imposed by the Reso-

1. The relevant portions of the Resolution provide as follows:

"11. That the following entrance fees or assessments against each candidate for nomination or election in such Primary Elections, except as to County offices, be and the same are hereby fixed and levied: (a) against each candidate for nomination for any remunerative office other than a County office, and except as herein provided, 2% of the salary of such office for the first year of the new term from every lawful source, including supplements from the Counties for Circuit Judges and District Attorneys, but not including expense allowances to Circuit Judges, District Attorneys, or members of Congress; except, however, that in case of candidates for remunerative office for an unexpired term, other than a County office, the amount to be paid shall be one-half of the amount which would be paid if said candidates were running for a full term; (b) against each candidate for the U. S. House of Representatives, 1% of the salary of such office for the first year of the new term from every lawful source; (c) against each candidate for Delegate or Alternate Delegate to the Democratic National Convention, $10.00.

"12. That no candidate for nomination for any office other than a county office and no candidate for election as a Delegate or Alternate Delegate to the Democratic National Convention who fails to pay the assessment required to be paid by him on or before 12:00 noon on March 1, 1972, or fails to file his declaration in the form herein prescribed on or before said

hour and date to and with the Chairman of the State Democratic Executive Committee shall have his name printed on the ballot nor shall votes for such candidate so failing to qualify be counted. Likewise, that no candidate for nomination for any county office who fails to pay the assessment required to be paid by him on or before 12:00 noon, on March 1, 1972, or fails to file his declaration in the form herein prescribed on or before said hour and date to and with the Chairman of the County Democratic Executive Committee shall have his name printed on the ballot nor shall votes for such candidate so failing to qualify be counted."

2. Section 347 provides in relevant part: "* * * but every state executive committee of a party shall have the right, power and authority to * * * determine who shall be * * * candidates [in the primary election and] nothing herein contained shall be so construed as to prohibit any state executive committee of a party from fixing assessments or such other qualifications, as it may deem necessary, for persons desiring to become candidates for nomination to offices at a primary election, but such assessments shall not exceed two per cent of one year's emolument from all sources, of the office sought, and for an unremunerative or party county office it shall not exceed five dollars, or twenty-five dollars for an unremunerative or party office to be filled by the vote of a subdivision greater than one county, or one hundred dollars for an unremunerative or party office filled by the vote of the whole state."

lution. Before proceeding to the merits, several preliminary matters must be resolved.

■ Federal jurisdiction is invoked under 28 U.S.C. §§ 1331, 1343 and 2201, under 42 U.S.C. § 1983, and under the equal protection clause of the fourteenth amendment. Clearly this Court has subject-matter jurisdiction. Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L. Ed.2d 92 [1972].

■ On March 14, 1972, the originating district judge granted a temporary restraining order which required the defendants to place Harper's name on the ballot without payment of the qualifying assessment.[3] On that same day, a three-judge district court was empaneled pursuant to 28 U.S.C. §§ 2281 and 2284. Section 2281 requires that such a court be constituted whenever an injunction is sought upon federal constitutional grounds against enforcement of an order of state-wide impact made by an administrative board or commission acting under state statute. Alabama Public Service Commission v. Southern R. Co., 341 U.S. 341, 343 n. 3, 71 S.Ct. 762, 95 L.Ed. 1002 (1951) (one challenging an order need only assert the unconstitutionality of the order, not the invalidity of the progenitive statute); Meredith v. Fair, 305 F.2d 343 (5th Cir.), cert. denied 371 U.S. 828, 83 S.Ct. 49, 9 L.Ed.2d 66 (1962) (the order attacked must be of state-wide impact). Here Harper seeks to enjoin such an order, that is, a Resolution of the Alabama Democratic Party promulgated pursuant to a State statute. Clearly this cause is properly before a court of three judges.

■ Defendants contend that the Executive Committee of the Alabama Democratic Party has never been requested to provide an alternative to the payment of a qualifying fee. Rather than require plaintiff to exhaust such administrative steps, we adhere to the principles announced in McNeese v. Board of Education, 373 U.S. 668, 671, 83 S.Ct. 1433, 1435, 10 L.Ed.2d 622 (1963), where the Supreme Court held that a section 1983 suit "may not be defeated because relief was not first sought under state law * * *." See Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L. Ed.2d 492 (1961). Certainly we would not compel a litigant challenging the constitutionality of a state statute to petition the state legislature to repeal the offending provision prior to his bringing suit in federal court. Similarly, we will not require Harper to seek redress from the defendant Executive Committee. For even if the Committee were to grant Harper relief it could reverse its decision with respect to future primary elections.

■ Next we consider whether Harper has standing to bring this suit. He contends that, because he is *unable* to pay the fee, the assessment scheme at issue unconstitutionally infringes both on his right to vote and on his right to be a candidate. Alternatively, Harper contends that the imposition of a qualifying fee is unconstitutional even if he were able but merely *unwilling* to pay. We conclude that on the basis of Harper's testimony at trial he has established his

---

Section 348 provides:

"Any person desiring to submit his name to the voters in a primary election shall, not later than March first, next preceding the holding of such primary election, file his declaration of candidacy in the form prescribed by the governing body of the party with the chairman of the county executive committee if he be a candidate for a county office, and with the chairman of the state executive committee, if he be a candidate for any office except a county office, and in like manner, and not later than March first, next preceding the holding of such primary election, pay any assessments that may be required to be paid by him."

3. Defendants have stipulated that Harper's name will not be removed from the ballot regardless of the outcome of this litigation. To remove his name every ballot would have to be reprinted. The resulting expense would be too high and the time would be too short.

inability to pay the fee.[4] Accordingly, we do not reach the question whether he has standing to assert his alternative claim, nor, for that matter, will we consider the merits of that claim.

■ At present Harper is not employed for current gain, though he is involved in writing a book. The bulk of his assets is comprised of two life insurance policies having a combined, cash value of some $1700.00 and of his personal belongings. Hence, even though unemployed, Harper has assets sufficient to permit compliance with the filing fee requirement. Yet one need not show complete lack of funds to prove that he is unable to pay a fee. As the late Mr. Justice Black, speaking for a unanimous Court, opined with respect to the federal statute permitting one to file suit *in forma pauperis*:

> "We cannot agree with the court below that one must be absolutely destitute to enjoy the benefit of the statute. * * * To say that no persons are entitled to the statute's benefits until they have sworn to contribute to payment of costs, the last dollar they have or can get, and thus make themselves and their dependents wholly destitute, would be to construe the statute in a way that would throw its beneficiaries into the category of public charges. * * * [T]he result [is not] desirable if the effect of this statutory interpretation is to force a litigant to abandon what may be a meritorious claim in order to spare himself complete destitution."

Adkins v. E. I. DuPont De Nemours & Co., 335 U.S. 331, 339–440, 69 S.Ct. 85, 89, 93 L.Ed. 43 (1948). *Accord*, United States v. Cohen, 419 F.2d 1124 (8th Cir. 1969). In our view, requiring Harper to tender the $850.00 fee would render him so nearly destitute that we must invoke the above rationale and conclude

that he is presently unable to pay the filing fee.

As noted above, Harper questions the constitutionality of the assessment fee on two theories. First, asserting his right to be a candidate, he contends that the assessment scheme classifies candidates according to wealth in violation of the equal protection clause of the fourteenth amendment. Second, Harper argues that by imposing a fee the State has denied him access to the primary ballot and has thus impermissibly restricted his right to vote for the candidate of his choice, namely, himself. Without, for the moment, resolving the merits of Harper's bifurcated attack, we conclude that having established his inability to pay the assessment he has the requisite standing to assert his claim on both grounds.

The test of standing was recently adumbrated by the Supreme Court:

> "[Standing] concerns, apart from the 'case' or 'controversy' test, the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question."

Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). In order to meet the " 'case' or 'controversy' test" the Supreme Court requires that the complainant "have the personal stake and interest that impart the concrete adverseness required by Article III." Barlow v. Collins, 397 U.S. 159, 164, 90 S.Ct. 832, 836, 25 L.Ed.2d 192 (1970). In that he has shown his inability to pay the fee, Harper has brought himself within the scope both of the equal protection clause of the fourteenth amendment and of section 1983. Without cavil his claim gives rise to the necessary adverseness to sat-

---

4. A finding of inability depends not only on a lack of personal resources, but also on a lack of funds contributed by sup-

porters. See Bullock v. Carter, 405 U.S. at 134, 92 S.Ct. 849.

isfy Article III. Thus, Harper has standing to assert his rights both as a candidate and as a voter.

■ One final question to be resolved before turning to the merits of this suit is whether Harper can maintain a class action on his claim for deprivation of voting rights. Put shortly, Harper contends that by disqualifying him as a candidate defendants have infringed not only on his right to vote but also on the right of many others desiring to cast ballots for him.

■ Rule 23, Fed.R.Civ.P., establishes the requisites of a class action. Subsection (a) (1) of that rule provides that a class action will lie when "the class is so numerous that joinder of all members is impracticable." Harper has failed to demonstrate the existence of numerous other registered voters who desire to vote for him. Clearly, the burden is on him to make such showing. *See* Pacific Fire Ins. Co. v. Reiner, 45 F.Supp. 703 (E.D.La.1942). Accordingly, we hold that Harper has failed to establish a valid class action.[5]

Having determined that we have jurisdiction to entertain this cause, that Harper has standing to bring it and that the issues are ripe for adjudication, we now proceed to the merits.

### The Merits

■ The Resolution here at issue imposes on candidates in the Democratic primary an assessment of two per cent of the first year's salary for the offices to which they seek election, except on candidates for county offices, for the United States House of Representatives, or for delegate seats at the Democratic National Convention.[6] It has been stipulated that Harper possesses all the qualifications to run for United States Senator except that he has not paid the two per cent fee of $850.00 required of candidates seeking the Democratic Party nomination for that office. Under Alabama law, payment of the assessment levied by the governing authority of the political party is an absolute prerequisite to candidacy in the primary. See Title 17, §§ 347, 348, Code of Alabama. Neither Alabama statutes nor the rules of the Democratic Party permit one who is unable to pay the assessment to gain access to the primary ballot by presenting either a petition of voters or an affidavit of financial inability to pay the fee. Write-in votes are not allowed at the primary level. See ¶ 11 of Resolution, quoted n. 1, *supra*.

■ For purposes of the fourteenth amendment, imposition of a qualifying fee in this case constitutes state action, since authority for the schedule of fees devised by the Executive Committee of the Democratic Party is rooted in State statutes and since the holding of primaries is permitted by the State's legislature. *See* Bullock v. Carter, *supra*; Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963). Thus the issue becomes whether the Alabama scheme of qualifying assessments violates Harper's rights under the fourteenth amendment not to be unlawfully discriminated against either in his exer-

5. Since our decision with respect to the availability of class relief in this suit turns on Harper's failure to meet the requisites of subsection (a) (1) of Rule 23, we do not consider whether upon a showing of sufficient prospective voters he could satisfy the requirement of subsection (a) (3)—that the claims of the party bringing the class action be typical of the claims of the class.

6. The fee assessed against candidates running for the United States House of Representatives is one per cent of the first year's salary. The fee for candidates seeking election as delegates to the Democratic National Convention is $10.00. The fees imposed upon candidates for county offices are determined by the several county Democratic Executive Committees in accordance with the limitations provided in Title 17, § 347, Code of Alabama, quoted at note 1, *supra*.

cise of the franchise or in his attempt to become a candidate.

Since *Carter* is the watershed of authority on the constitutionality of qualifying fees for candidates, our analysis begins at that fount.

### A. *Bullock v. Carter*

*Carter* involved a challenge to the Texas filing fee system in which assessments ran as high as $8,900.00 for one county judgeship, and as much as 99.7 per cent of the annual salary for a particular county commission seat. The Supreme Court reasoned that the complainants in that case were, as in this suit, asserting their rights both as candidates and as voters. The Court noted that, "The threshold question to be resolved is whether the filing fee system should be sustained if it can be shown to have some rational basis, or whether it must withstand a more rigid standard of review." 405 U.S. at 142, 92 S.Ct. at 855 (footnote omitted). By careful analysis the Court reasoned that the close scrutiny test enunciated in Harper v. Virginia State Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), was applicable, but not because the right to be a candidate was at stake, a right to which as of yet the Court has not assigned "fundamental status." Moreover, it refused to impose the test merely because the Texas scheme classified candidates according to wealth. The Court held that "the very size of the fees imposed under the Texas system gives it a patently exclusionary character" and that as such the system "tends to deny some voters the opportunity to vote for a candidate of their choosing." 405 U.S. at 143, 92 S.Ct. at 856. Thus, the Supreme Court invoked the close scrutiny test on the ground that the fees at issue infringed on the fundamental right to vote.

Having determined the appropriate standard of review, the Court then proceeded to test the constitutionality of the Texas system. Two bases for the scheme were asserted. First, in Texas, the State did not assume the burden of financing the primary elections; rather, that expense was passed on to the political parties. The qualifying fees charged candidates were set sufficiently high to generate the enormous funds required to conduct the primaries. The Supreme Court held that relieving the State of the burden of financing such elections was a legitimate objective. In that sense, said the Court, the fee system was possessed of a rational basis. But, the Court continued, under a strict standard the State must demonstrate more than a legitimate objective; it has to make a showing of necessity. The Court then reasoned that there is no necessity for the State to shift to the parties the burden of financing primaries. Hence the resultant abrogation of voting rights is not justifiable.

Texas also asserted that imposition of a qualifying assessment discourages frivolous candidates, prevents clogging of the election machinery, and assures the winner of the primary is the choice of the majority. These goals are legitimate and the Court so held. However, it noted that "a State cannot achieve its objectives by totally arbitrary means; the criterion for differing treatment must bear some relevance to the object of the legislation. Morey v. Doud, 354 U.S. 457, 465 [77 S.Ct. 1344, 1 L.Ed.2d 1485] (1957); Smith v. Cahoon, 283 U.S. 553, 567, [51 S.Ct. 582, 75 L.Ed. 1264] (1931)." The Court then concluded that, although "[t]here may well be some rational relationship between a candidate's *willingness* to pay a filing fee and the seriousness with which he takes his candidacy," where a candidate is *unable* to pay a fee its imposition is not a "reasonable tool for regulating the ballot." 405 U.S. at 147, 92 S.Ct. at 858 (emphasis supplied) (footnote omitted). Thus, the Court held that, when a State imposes a fee as a precondition to candidacy and affords no alternative means of access to the ballot, such fee system lacks a rational basis.

## B. *The Alabama Fee System*

In light of *Carter*, we find that the fee system presently imposed on candidates in the forthcoming Democratic primary is unconstitutional as related to Harper's candidacy. In so holding, we find no need to determine whether the standard of review is one of close scrutiny. *Cf. Harper, supra.* For in our view the Alabama scheme fails even the less restrictive rational basis test.

Defendants assert that the primary justification for imposition of a qualifying fee is to discourage frivolous candidates. Requiring a fee of those able to pay it may help discourage some financially secure, frivolous candidates. Even so, defendant Vance testified that under the present system several fraudulent candidacies have been perpetrated, as, for example, when a candidate provided the fee for an individual bearing the same name as one of his opponents in the race. On the other hand, some serious candidates of meager means may well be disqualified. Despite some doubt, we are constrained to treat Harper as a "serious" candidate. A candidate need not intend to win in order to be deemed serious in his endeavor. It suffices that he merely intends, by entering the race, to influence the thinking of the front-running candidates, of the party, or of the voters.[7]

Defendants ask that we consider the realities of elective politics. They contend that running for public office, particularly for the United States Senate, is an expensive venture. If Harper cannot raise the $850.00 filing fee, say the defendants, surely he cannot run successfully. But as we have noted, winning is not the only goal. Moreover, it is not for this Court to impose as a rule of constitutional law the principle that only near nabobs can run for office.

In sum, we fail to ascertain even a rational basis for prescribing a qualifying fee as the *sole* method of access to the ballot. See Bullock v. Carter, *supra.* When a candidate, such as Harper, is unable to pay a qualifying fee, there is no rational connection between his failure to do so and the seriousness of his candidacy. On the other hand, we recognize that lack of seriousness may well be inferred where one is able, but merely unwilling, to pay a fee. Hence we do not require that the filing fee scheme at issue be entirely abrogated. Rather, we impel defendants to arrive at some alternative means of weeding out frivolous candidates who are unable to pay a fee.[8]

7. In this vein we note the reasoning of the Supreme Court in *Carter:*
"[E]ven assuming that every person paying the large fees * * * takes his own candidacy seriously, that does not make him a 'serious candidate' in the popular sense. If the * * * fee requirement is intended to regulate the ballot by weeding out spurious candidates, it is extraordinarily ill-fitted to that goal; other means to protect those valid interests are available."
405 U.S. at 146, 92 S.Ct. at 857 (footnote omitted).

8. We do not find our holding to be inconsistent with *Carter.* In that case the Court struck what it found to be unreasonable fees. Admittedly it did not lend credence to a system in which unreasonable fees are charged, even where an alternative means of access to the ballot is provided. However, the Court emphasized that:
"It must be emphasized that nothing herein is intended to cast doubt on the validity of reasonable candidate filing fees or licensing fes in other contexts. By requiring candidates to shoulder the costs of conducting primary elections through filing fees and by providing no reasonable alternative means of access to the ballot, the State of Texas has erected a system which utilizes the criterion of ability to pay as a condition to being on the ballot, thus excluding some candidates otherwise qualified and denying an undetermined number of voters the opportunity to vote for candidates of their choice. These salient features of the Texas system are critical to our determination of constitutional invalidity."
405 U.S. at 149, 92 S.Ct. at 859.

**144**

Defendants also contend that the present scheme of filing fees should be sustained since it generates the monies needed to run the Democratic Party in Alabama. Our decision in this case in no way undermines that goal. Anyone wishing to qualify as a candidate in a future Democratic primary who is able to pay the fee presently imposed must do so. All we require is that serious, impecunious candidates, who under the present system would be excluded and who therefore would not be contributing to the party coffers, be admitted to candidacy.

■■■ In light of the above discussion, we declare the present filing fee system in Alabama to be unconstitutional insofar as it provides no alternative method of access to the ballot for those who are unable to tender the required fees.

■■■ In fashioning the appropriate relief we note that Harper's name has already been placed on the ballot for the forthcoming primary. Defendants have stipulated that his name will not be removed in any event. Moreover, they have expressed a willingness to structure an alternative means of access to the ballot for candidates of little means who seek election in future primaries.[9] We leave such task to defendants' discretion, noting of course that, if the method devised fails reasonably to achieve its end, it is subject to attack in this Court. Any such method must afford a real and substantial opportunity for a financially handicapped candidate who is serious in his candidacy to get on the ballot without expending an unduly burdensome sum of money. All other relief is denied. Each party is to bear his own costs.

Judgment entered accordingly.

In our view, the fees presently charged in Alabama are not inherently unreasonable. And in the context of an alternative means of getting on the ballot, we sustain the present fee schedule.

9. One method might be to permit financially unable candidates to qualify by

demonstrating their inability to pay. See footnote 4 and accompanying text *supra*. In the event such a method is adopted, it is for the defendants to formulate both the test of inability and the proof thereof.