[No. 42502. En Banc. July 19, 1973.]

DOUGLAS W. SWANSON, *Plaintiff*, ANN MONTAGUE *et al.,* *Appellants,* v. A. LUDLOW KRAMER, *as Secretary of State,* *Respondent.*

*Barry E. Barnes, Eugene M. Moen,* and *Robert T. Czeisler,* for appellants.

*Slade Gorton, Attorney General,* and *Wayne L. Williams, Assistant,* for respondent.

HALE, C.J.—Plaintiffs sought nomination to public office at the September, 1972, primary election, claiming that they could not afford the filing fee nor the cost of campaign

advertising in the state-distributed candidates' pamphlet. They requested a declaratory judgment holding unconstitutional and void RCW 29.18.050, 29.24.070 and 29.80.050, which require the payment of candidate filing fees and for participating in the state's candidates' pamphlet. From a summary judgment of the Superior Court for Thurston County dismissing the complaint, the case comes here on an agreed statement of facts.

The plaintiffs are citizens of the United States, electors of the state, and qualified to run for public office. Before the candidate's name may be placed on the ballot, the Secretary of State, under RCW 29.18.050, must require of him a fee equal to 1 percent of the annual salary of the office which he seeks. The Secretary of State prepares and furnishes a candidates' pamphlet to each registered voter in the state. RCW 29.80.010.

A candidates' pamphlet containing the photograph and campaign statement of each eligible nominee who desires to participate is mailed to all voters of this state prior to each state general election by a mandate in RCW 29.80.010. In order for material to be published and distributed in the candidates' pamphlet, RCW 29.80.050 requires a fee of $200 for United States Senator, Representative in Congress, and Governor, and $100 for other state offices. New or minor political parties, as the statute describes them, may nominate at conventions held on the day of the primary election. RCW 29.24.020. Candidates so nominated may then file their declarations of candidacy with the Secretary of State, but must, nevertheless, pay the 1 percent filing fee to get on the general election ballot. RCW 29.24.070.

According to the agreed statement of facts, plaintiffs Ann Montague and Judith A. Moschetto are members of the Socialist Workers Party and would seek that party's nomination for Secretary of State and Seventh District Representative in Congress, respectively. Filing fees are $150 for the office of Secretary of State and $425 for the office of Congressman. Plaintiff Gary M. Johnson, candidate for the nonpartisan office of Superintendent of Public Instruction

must pay a fee of $225 before his declaration of candidacy will be accepted and his name placed on the primary election ballot. The Secretary of State informed all plaintiffs, that, if they were nominated by convention, he would require payment of the filing fees before their names could go on the general election ballot; he would also require them to pay the statutory fees for their participation in the candidates' pamphlet.

Plaintiffs Montague and Johnson, according to the statement of facts, were "unemployed, receiving no income, and living with family or friends." Plaintiff Moschetto was "employed and earning between $400.00 and $500.00 per month." It was agreed that each, for the purposes of this action, could not afford the filing fee or the fee for the candidates' pamphlet. The record does not reveal that any of the plaintiffs, prior to commencing this suit, had attempted to raise campaign funds or solicit contributions with which to pay the fees.

Other parties joined in this action as plaintiffs, alleging that they are all qualified and registered voters, that they desire an opportunity to vote for plaintiff candidates who are financially unable to pay the filing fees, but that they will be unconstitutionally prevented from doing so because of the financial requirements of the statutes.

The parties agree, too, that the state's interests in a filing fee system are "(1) prevention of overcrowded ballots, (2) assuring seriousness of candidacy, and (3) partially defraying election costs." On this stipulated point, we take it to be a principle of statutory interpretation that, although the parties may agree as to the legislative intention or purpose and by agreement delineate what they believe the public interests may be, the views of a court of review may not be limited by the parties' stipulation. The court, we believe, is not necessarily bound by such agreement and is free to reexamine the agreed premise, seek out and ascertain the legislative intentions, and sua sponte reach the same, a similar, or an altogether different conclusion.

Plaintiffs, as noted, appeal from a summary judgment of dismissal and the court's denial of their motion for a summary judgment declaring the filing fees and pamphlet fees unconstitutional and the statutes prescribing them void. The filing fees and pamphlet fees are unconstitutional, they say, because they are not necessary to promote what is called a compelling state interest, they violate the equal protection clause and the due process clauses of the fourteenth amendment to the United States Constitution, and they contravene the freedom of expression provision of the First Amendment. We find these contentions untenable.

The statutes now under challenge cover a wide range of political activity. Fees for filing declarations of candidacy for partisan offices are prescribed as follows:

> A fee of one dollar must accompany each declaration of candidacy for a precinct office without salary; a fee of ten dollars for any office with a compensation attached of one thousand dollars per annum or less; a fee equal to one percent of the annual compensation for any office with a compensation attached of more than one thousand dollars per annum.

RCW 29.18.050. Fees for certain nonpartisan offices are similarly assessed (RCW 29.21.010), and the same fee schedules prevail where nomination is by convention. RCW 29.24.070. Fees exacted for utilizing the state-distributed campaign pamphlet are likewise prescribed by statute. RCW 29.80.050.

Is it a denial of equal protection of the laws, due process of law, and freedom of speech and expression for the state to require a candidate's filing fee of 1 percent of the annual salary as a condition precedent to having one's name printed upon the ballot or to require a fee for participation as a nominee in a publicly prepared and distributed candidates' campaign pamphlet?

The validity of the 1 percent filing fee for candidates was flatly upheld by this court as being both reasonable and constitutional in a case on all fours with this one in *State ex rel. Boomer v. Nichols,* 50 Wash. 529, 97 P. 733 (1908). There we said, at page 530:

The amount of the fee required is based on a per centum of the salary of the office for which the person is a candidate, instead of a fixed fee for all candidates alike, and it is this feature that is thought to render the requirement void. But we can see no reason why this is not a reasonable regulation. The fee exacted must be measured by the standard of the individual case, not by what others may be required to pay for running for another and different office.

Earlier, in passing upon this precise question, this court had sustained the filing fee statute in these words:

The right to exact a reasonable fee for the privilege of running for office may be sustained on the principle that fees in actions and proceedings in courts and for filing and recording papers are sustained, namely, that those who seek the benefit of a particular proceeding provided by law may be compelled to reimburse the state for a portion of the costs the state incurs in maintaining the instrumentalities necessary to carry into effect the particular proceeding.

*State ex rel. Zent v. Nichols,* 50 Wash. 508, 520, 97 P. 728 (1908). On the basis of these principles, a reasonable filing fee as a condition to having the candidate's name printed on the ballot apparently has not since been questioned in the courts of this state. ·

■■ Plaintiffs base their argument primarily upon the rationale of *Bullock v. Carter,* 405 U.S. 134, 31 L. Ed. 2d 92, 92 S. Ct. 849 (1972). That case, a unanimous decision of the seven justices sitting, we think, in essence sustains the instant filing fee statute and supports the Secretary of State's position here. *Bullock* involved the candidates' filing fee statutes of Texas, which, we think, prima facie prescribed an exorbitant and hence unreasonable and unconstitutional system of filing fees. In Texas, a candidate for office of county commissioner at the primary election was required to pay a fee of $1,424.60; one seeking nomination at the Democratic primary to the office of county judge was required to pay a filing fee of $6,300; and the third, a candidate seeking to be nominated as Democratic candidate

for commissioner of the general land office, had to put up $1,000.

The Texas statutes in other contexts appeared to create a conglomeration of varied standards depending upon whether the office was countywide or statewide with little or no reference to the salary or other lawful emoluments. For example, the $6,300 demanded of one of the parties in *Bullock* represented 32 percent of the annual salary of $19,700 of the office of county judge; another office requiring a filing fee of $6,250 represented 76.6 percent of the annual salary of $8,160 for each of five other county offices; and the filing fee for county commissioner equaled 99.7 percent of the annual salary of $6,270. None of these candidates had the money with which to pay the fees of $1,424.60, $6,300 and $1,000, and were all denied places on the Democratic primary election ballot. So high were the filing fees, according to the Texas statutes, that on their face they have little relevance to the statutes of this state now under inquiry which fix the filing fees at only 1 percent of the annual salary.

But that is not the end of the differences. As the court pointed out in *Bullock*, at page 137:

> Under the Texas statute, payment of the filing fee is an absolute prerequisite to a candidate's participation in a primary election. There is no alternative procedure by which a potential candidate who is unable to pay the fee can get on the primary ballot by way of petitioning voters, and write-in votes are not permitted in primary elections for public office.

In Washington, however, there is no such categorical statutory bar against off-ballot participation in either our primary or general elections. "[A]ny voter may write in on the ballot the name of any person for whom he desires to vote for any office and such vote shall be counted the same as if the name had been printed on the ballot and marked by the voter . . ." RCW 29.51.170. Although running for office as a write-in or sticker candidate may put one under disadvantages, the right to do so, to a substantial extent,

does operate to alleviate one of the unconstitutional features of the Texas statutes: Under the Washington statutes, one with no funds whatever may stand for election as a write-in candidate and his friends, followers and adherents may actually elect him, for the election history of this state shows many occasions when sticker candidates have not only made a good showing, but have won the office.

*Bullock* recognized the alternative of standing for election by sticker or write-in as an element tending to shore up the constitutionality of an election filing fee statute. The opinion acknowledges that the state has a broad power to fix voter qualifications and the manner of elections, recognizing this, however, as a power to be exercised in a manner consistent with the equal protection clause of the Fourteenth Amendment. The opinion categorically declares that the state does have a legitimate interest both in regulating the ballot and in partially relieving the state treasury of the cost of conducting the primary election and "in this limited sense it cannot be said that the [Texas] fee system lacks a rational basis," citing *Harper v. Virginia Bd. of Elections,* 383 U.S. 663, 16 L. Ed. 2d 169, 86 S. Ct. 1079 (1966).

Finally, there is the caveat at page 149, expressing what appears to us to be a rule of decision that, "It must be emphasized that nothing herein is intended to cast doubt on the validity of *reasonable* candidate filing fees or licensing fees in other contexts." (Italics ours.)

There thus exists a legitimate interest of the state in legislation requiring the payment of a reasonable fee as a condition for having one's name placed on the ballot. And the state has a legitimate interest, too, in spreading the costs of the election in modest degree more heavily among the candidates than among the electorate in general, because, in the very nature of things, the candidates derive some greater benefit from the elective process than do the people at large. We do not think that the constitution requires us to measure and strike a balance between the exercise of both of the two benefits, *i.e.,* the right to vote

and the right to run, for even with the collection of the filing fees the major costs of putting on the election will still be borne by the people through general taxation.

> [T]hose who seek the benefit of a particular proceeding provided by law may be compelled to reimburse the state for a portion of the costs the state incurs in maintaining the instrumentalities necessary to carry into effect the particular proceeding.

*State ex rel. Zent v. Nichols, supra* at 520.

The state has a legitimate interest, too, in discouraging frivolous and prankish candidacies, and use of the ballot for political stunts or for fraudulent filings. Although these probably are not completely obviated by the exaction of a reasonable filing fee, the legislature has a constitutional right to assume they are thus discouraged and reduced. Related to these considerations against frivolous and prankish filings and the employment of the ballot for political stunts is the possibility that a filing fee will tend to keep the ballot to a comprehensible and reasonable size, and will discourage pointless overcrowding—an overcrowding which may operate to deprive the electoral process of complete integrity and ultimately interfere with the voters' exercise of a rational choice among the candidates and issues. The fee system, if reasonable and not unduly onerous, therefore, does rest on a rational basis in tending to attain legitimate state objectives and is a valid and constitutional exercise of legislative power.

The same rationale largely, we think, supports the requirement of a fee for including and distributing the candidate's picture and campaign material in the official candidates' pamphlet. No one disputes that having one's picture and campaign material printed and circulated through the mails to all registered voters in the state at a charge of $100 or $200 is a bargain. All candidates for the same office desiring to participate in the candidates' pamphlet received equal and uniform treatment both as to the space allotted and the word limit in the printed message. RCW 29.80.020. Because of the modest cost for benefits made available by

the statutes providing for the candidates' pamphlet to all candidates upon the same terms and conditions, there appears to be no denial of equal protection or equal treatment at the hands of the state.

Perhaps the electorate would not countenance the publication and circulation of such a pamphlet wholly at public expense if no part of its cost whatever was to be shared by the candidates who, as a class, benefit the most from it. Thus, the alternative may be whether it is better to have a candidates' pamphlet with part of its expense borne by candidates, or no pamphlet at all; whether it is better to have some modest and reasonable restraint placed upon the frivolous, idle, fraudulent or overcrowding use of the pamphlet, or abolish the pamphlet entirely. We think it neither a denial of equal protection nor an abridgment of freedom of speech or expression to require by statute the modest fees now required as a condition for inclusion of the candidates' pictures and materials in the candidates' pamphlet and its distribution at public expense.

ROSELLINI, HUNTER, and HAMILTON, JJ., concur.

FINLEY, J. (concurring specially)—While I concur in the result reached by the majority, I am compelled to briefly respond to certain significant issues raised by the appellants and the dissent which are not discussed sufficiently in the majority opinion to satisfy my individual concern about this case.

Traditionally, the equal protection clause has required simply that "[n]o state . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. 14. The progression of the law in the area of equal protection has resulted in the development fairly recently of certain standards for determining the validity of a challenged statute or ordinance, i.e., the "compelling", and the "legitimate" state interest tests. Whether a given equal protection challenge is to invoke the close scrutiny of the judiciary associated with the compelling state interest test, or a less strict form of review under the legitimate state

interest or "rational basis" test has in the past been susceptible of overly simplistic determinations by reference to a judicially recognized system of categories comprising "suspect classifications" and "fundamental interests".[1] Quite recently, however, these tests themselves have been subjected to close scrutiny, and a tendency away from overly precipitate categorization toward more careful analysis seems to be evident in equal protection cases.

As a result of confusion generated by inadequate analysis, *Bullock v. Carter*, 405 U.S 134, 31 L. Ed. 2d 92, 92 S. Ct. 849 (1972), is the primary basis not only for the majority but also for the dissenting opinion in the instant case. The difficulty inherent in *Bullock* is implicit in the following:

> Because the Texas filing-fee scheme has a real and appreciable impact on the exercise of the franchise, and because this impact is related to the resources of the voters supporting a particular candidate, we conclude, as in *Harper*, that *the laws must be "closely scrutinized" and found reasonably necessary to the accomplishment of legitimate state objectives* in order to pass constitutional muster.

(Italics mine.) 405 U.S. at 144. Upon close reading the contradiction in the above statement from *Bullock,* in linking "close scrutiny" with the "legitimate state objectives" test, becomes apparent. It is further demonstrated by examination of numerous opinions of the court which inextricably connect "close scrutiny" by the judiciary only with the requirement that necessary and compelling state interests be shown, rather than merely "legitimate state objectives".[2] Additionally, *Harper v. Virginia Bd. of Elections,* 383 U.S. 663, 16 L. Ed. 2d 169, 86 S. Ct. 1079 (1966) has constituted one of the primary bases for application of the *compelling* state interest test. *See, e.g., Williams v.*

---

[1] *See* Comment, *Developments in the Law—Equal Protection,* 82 Harv. L. Rev. 1065 (1969); Tussman & tenBroek, *The Equal Protection of the Laws,* 37 Calif. L. Rev. 341 (1949).

[2] *See, e.g., Loving v. Virginia,* 388 U.S. 1, 18 L. Ed. 2d 1010, 87 S. Ct. 1817 (1967); *Skinner v. Oklahoma ex rel. Williamson,* 316 U.S. 535, 86 L. Ed. 1655, 62 S. Ct. 1110 (1942).

*Rhodes,* 393 U.S. 23, 21 L. Ed. 2d 24, 89 S. Ct. 5 (1968);
*Levy v. Louisiana,* 391 U.S. 68, 20 L. Ed. 2d 436, 88 S. Ct.
1509 (1968). The fluctuating nature of these equal protec-
tion tests[3] faced the court in *Bullock* and leaves this court
in the quandary in which it now finds itself.

Perhaps the clearest pronouncement of the fundamental
criterion of the compelling state interest test was that re-
cently stated in `Frontiero v. Richardson,* 411 U.S. 677, 686,
36 L. Ed. 2d 583, 93 S. Ct. 1764 (1973) as follows:[4]

> Moreover, since sex, like race and national origin, is an
> *immutable characteristic* determined solely by the acci-
> dent of birth, the imposition of special disabilities upon
> the members of a particular sex because of their sex
> would seem to violate "the basic concept of our system
> that legal burdens should bear some relationship to indi-
> vidual responsibility . . . ." *Weber* v. *Aetna Cas-
> ualty & Surety Co.,* 406 U. S. 164, 175 (1972).

(Italics mine.) It is evident from this reasoning in *Frontiero*
that the critical factor in determining the applicability of
the compelling state interest test—with its stricter standard
of judicial review—is the "immutability" of the character-
istic or condition which serves as the statutory basis for
discriminatory treatment.[5] This conclusion is exemplified
in the otherwise confusing and contradictory statement
in *Bullock* which, as noted earlier, appears causally related
to the fact of inconsistent constructions of *Bullock* by the
majority and dissent herein. That is, the previous
mechanical and automatic approach to the equal pro-
tection clause—suggested by invocation of the compelling

---

[3]*See* Gunther, *In Search of Evolving Doctrine on a Changing Court:
A Model for a New Equal Protection,* 86 Harv. L. Rev. 1 (1972).

[4]This reasoning is taken from the plurality opinion of the court in
*Frontiero.*

[5]"Perhaps the answer is that race and lineage are congenital and
unalterable traits over which an individual has no control and for
which he should receive neither blame nor reward. In a society which
proclaims that all men are created equal, such traits presumptively
present no basis for an inference of differing worth." Comment, *Equal
Protection, supra* at 1126-27.

state interest test simply where a particular characteristic or condition fits easily within certain well-established "suspect classifications"—is no longer appropriate to or consistent with a fair and meaningful mode of judicial review. Rather, the compelling state interest test should be applied to the case where it can be demonstrated that the subject characteristic or condition is "immutable" and realistically incapable of modification by the individual or group facing alleged discriminatory treatment as a consequence of the challenged statute or ordinance. It is within the context of this approach to the compelling state interest test that the instant statutory scheme concerning candidate filing fees should be examined.

In this regard, the appellants assert that "wealth", and its counterpart "indigency", constitute a suspect classification, citing supportive cases, and that discrimination on the basis of wealth is forbidden by the equal protection clause unless it is necessary to promote a *compelling* state interest. However, as indicated above, the recent reevaluation by the United States Supreme Court of the tests for judicial review under the equal protection clause apparently no longer affords room for a determination of constitutional validity by "pigeon-holing"—resting the applicability of the compelling state interest test upon the accessibility of a given characteristic to an established "suspect" classification. Rather, the merits of each case and its subject condition or class must be examined individually. In the immediate case, it is unrealistic to conclude broadly or categorically that the condition of indigency invokes application of the compelling state interest test (*see Ortwein v. Schwab,* 41 U.S.L.W. 3474 (March 1973)), or that a potential candidate of average intelligence and motivation would forever, under all circumstances, face insurmountable difficulties in raising the necessary fees for filing for office in our state. Indeed, a lack of wealth cannot in this case be reasonably found to constitute an "immutable characteristic" as is otherwise almost universally true where a legislative classifi-

cation is based upon such criteria as a person's sex,[6] race,[7] or legitimacy of birth.[8]

If, under our statutory scheme, Washington's required fees for candidacy filing were deemed exorbitant and unreasonable—as were the Texas fees in Bullock[9]—then it would indeed be questionable whether the appellants herein who claim a status of indigency would realistically be able to gather sufficient sources of funding to meet the required amount. In such a case, application of the compelling state interest test, as advocated by the appellants, would constitute appropriate judicial review. However, it is not contended by the appellants that the Washington filing fees are exorbitant; rather, it is the indigent status of these parties that is advanced as the basis for declaring our statutory scheme repugnant to the equal protection clause. Nor does the dissent herein suggest that these filing fee amounts are unreasonable. Under the circumstances, absent any contrary indication, the immediate filing fee amounts must be presumed to be reasonable. In this regard, the variance between Washington filing fees and the much larger Texas fees in Bullock is substantial.[10] Thus there is no apparent reason to support a conclusion that the subject filing fees are not reasonable. Consequently, the application of the compelling state interest test upon the basis of the characteristic of "wealth" is logically inappropriate to a

---

[6]See, e.g., Frontiero v. Richardson, 411 U.S. 677, 36 L. Ed. 2d 583, 93 S. Ct. 1764 (1973).

[7]See, e.g., Bolling v. Sharpe, 347 U.S. 497, 98 L. Ed. 884, 74 S. Ct. 693 (1954).

[8]See, e.g., Levy v. Louisiana, 391 U.S. 68, 20 L. Ed. 2d 436, 88 S. Ct. 1509 (1968).

[9]It is true, as indicated by the dissent, that one filing fee within the Texas system reviewed in Bullock amounted to only $50. However, it is evident from a close examination of Bullock and the court's frequent reference to the Texas fee system as exorbitant, large, and unreasonable that the $50 fee was not the subject of the court's review, but was merely incidental to the otherwise exorbitant fee schedule.

[10]The fees which form the subject of the instant litigation range from $150 to $425; the Texas fees dealt with by the United States court in Bullock ranged from $1,000 to $6,300.

determination of the equal protection challenge in the instant case.

The above rationale pertaining to application of the compelling state interest test upon the basis of wealth is equally pertinent to the franchise of voting which the dissent characterizes as "fundamental" and contends requires the automatic application of this stricter test. Since the primary impact of the Washington statutory scheme for candidate filing fees is upon the candidate, any impact upon the public exercise of the voting franchise is secondary at best. Past decisions of the United States Supreme Court, cited by the dissent, which characterized voting as a fundamental interest requiring invocation of the compelling state interest test, *involved direct and substantial rather than theoretical obstacles to the personal and immediate exercise of the right to vote.* Thus, the incidental effect of the immediate filing fee requirement upon the voting public should not be sufficient, in and of itself, to sustain an invocation of the compelling state interest in this case. Any standard of review incorporating more than the legitimate state interest or rational basis test is unnecessary and inappropriate to our determination herein.

The issue before this court, then, is whether the instant filing fee system is reasonably related to a legitimate interest or objective of the state. Pertinent to this issue is the following language from *Bullock*:

> In addition to the State's purported interest in regulating the ballot, the filing fees serve to relieve the State treasury of the cost of conducting the primary elections, and *this is a legitimate state objective;* in this limited sense it cannot be said that the fee system lacks a rational basis.

(Italics mine.) *Bullock v. Carter,* 405 U.S. 134, 147, 31 L. Ed. 2d 92, 92 S. Ct. 849 (1972). This reasoning of the Supreme Court resolves both the issue of whether a legitimate state interest exists to which the fee system bears some relation, and that of whether this relation is, in fact, rational, affording sufficient justification for the required

fees. In concluding (1) that the fees assist the state in the financing of primary elections, (2) that assistance in financing elections is a legitimate state interest, and (3) that the fee system provides a rational means for the achievement of these legitimate ends, the Supreme Court has settled the dispute which we face in this case. Pursuant to the applicable test for determining the existence and legitimacy of a justificatory state interest, it is evident that the equal protection clause is neither violated nor offended by our statutory requirement that a candidate for public office pay a reasonable filing fee.

The preceding discussion, in my best judgment, amply resolves the issue before this court. However, considering recent, if not current, experience with disruptive tactics on the part of certain individuals and groups in a variety of contexts, I am disturbed by what seems to me a real probability of a substantial threat to our political processes which inheres in the judicial obliteration of candidacy controls. I have in mind the likelihood of disruptive mass-filings, overcrowded ballots for disruptive purposes, and the arrest of effective voter participation in the electoral process through sheer confusion. The serious potentiality of such a result was evinced by the multiple filings which occurred, even with statutory controls, during our 1972 primary elections.[11] In this regard, the court in *Bullock* recognized as "legitimate" the interest of the state in seeking to

> prevent the clogging of its election machinery, avoid voter confusion, and . . . overcrowded ballots. Moreover, a State has an interest, *if not a duty*, to protect the integrity of its political processes from frivolous or fraudulent candidacies.

(Italics mine.) *Bullock v. Carter, supra* at 145. As suggested earlier, it was the exorbitant character of the Texas fee schedule which dictated a determination by the

---

[11]According to the Election Division of the Office of the Secretary of State, the average 1972 primary election ballot contained the names of some 75 candidates for public office.

Supreme Court that the legitimate interest of the State of Texas in deterring fraudulent or mass filings and consequent voter confusion could not prevail against the unreasonable fees charged, and imposed upon candidates for public office. Equally evident was the court's specific caveat concerning overextension of the *Bullock* decision beyond the exorbitant Texas schedule, emphasizing that "nothing herein is intended to cast doubt on the validity of reasonable candidate filing fees." 405 U.S at 149. Though perhaps not the only means of realizing the above legitimate interests of the state which were recognized in *Bullock,* it is apparent that the reasonable Washington filing fee requirement imposes and provides a proper and essential measure of candidacy controls, yet is inoffensive to the equal protection clause.[12] To summarize then, in the absence of a showing that an individual or group has borne discriminatory treatment upon the basis of an "immutable characteristic", or that some fundamental interest is directly inhibited by our statutory scheme, it is inappropriate to apply the compelling state interest test to this equal protection challenge. The facts and circumstances in this case demonstrate the basis for application of only the legitimate state interest test. Measuring the constitutionality of the Washington fee schedule by means of this latter test, keeping in mind the language of the Supreme Court in *Bullock,* it is evident that our reasonable filing fees for candidacy are consistent with the mandates of the equal protection clause.

On the basis of the reasons indicated, I concur in the majority opinion.

STAFFORD and WRIGHT, JJ., concur with FINLEY, J.

---

[12]Retaining the restriction of a reasonable filing fee will not, of itself, totally obviate the possibility of fraudulent and frivolous candidacies; however, until such time as it behooves the legislature to enact remedial measures permitting access to candidacy filing by means alternative to the payment of a reasonable fee (*e.g.,* permitting the filing of petitions containing a required number of signatures from qualified voters), our current fee requirement, as promotive of serious candidacy, appears to provide an essential control, albeit less than an exclusive panacea.

UTTER, J. (dissenting)—This state violates the equal protection of laws by requiring fees for candidate declaration and ballot appearance and also for inclusion in the candidates' pamphlet.[13] To require the fees excludes those candidates who cannot afford to pay and denies the voters the opportunity to vote for candidates so excluded. Such laws do not promote any compelling state interest, or provide a rational basis by which any legitimate state interest may be advanced.

The only authority cited by the majority which permits the operation of such a fee scheme is our 1-page per curiam opinion in *State ex rel. Boomer v. Nichols,* 50 Wash. 529, 97 P. 733 (1908). *Boomer* is not authority for this case because it did not face or dispose of the issue we decide here and it could not make a choice between the legitimate state interest or compelling state interest tests inasmuch as the compelling state interest test was not then part of the equal protection doctrine.

The majority also attempts to distinguish *Bullock v. Carter,* 405 U.S. 134, 31 L. Ed. 2d 92, 92 S. Ct. 849 (1972), the recent decision of the United States Supreme Court forbidding a substantially similar filing fee scheme, on grounds that are, in fact, not distinguishable. This case compels a result different from that announced by the majority.

The majority fails to either cite or discuss the cases decided subsequent to *Bullock,* all of which hold fee schemes, substantially identical to ours, to be forbidden. The majority also fails to discuss *Sorenson v. Bellingham,* 80 Wn.2d 547, 496 P.2d 512 (1972), a recent decision by this court directly in point on the question of the appropriate standard of review, and our recent decisions which establish under what circumstances we will apply the compelling interest standard. *Hsieh v. Civil Serv. Comm'n,* 79 Wn.2d 529, 535-36, 488 P.2d 515 (1971); *Moen v. Erlandson,* 80 Wn.2d 755, 498 P.2d 849 (1972); *Herriott v. Seattle,* 81

---

[13]RCW 29.18.050, 29.21.060, 29.24.070 and 29.80.050.

Wn.2d 48, 60, 500 P.2d 101 (1972); *Sorenson v. Bellingham, supra; Eggert v. Seattle,* 81 Wn.2d 840, 505 P.2d 801 (1973); *DeFunis v. Odegaard,* 82 Wn.2d 11, 507 P.2d 1169 (1973).

The clause of the Fourteenth Amendment which declares "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws" is the source of the standard of review for this case. U.S. Const. amend. 14, § 1. This equal protection clause has a long history of case law application which has developed two standards of review—the "rational basis" test and the stricter scrutiny of the "compelling interest" test.[14]

In this case, the majority determines the rational basis test (*McGowan v. Maryland,* 366 U.S. 420, 425-26, 6 L. Ed. 2d 393, 81 S. Ct. 1101 (1961)) is the appropriate standard, citing our 1908 *Boomer* case. This is the wrong test to be used, as the compelling interest standard is necessary because fundamental rights are affected herein. *Bullock v. Carter, supra.*

The fundamental rights affected by the state action are those of voting and association. *NAACP v. Button,* 371 U.S. 415, 9 L. Ed. 2d 405, 83 S. Ct. 328 (1963); *Harper v. Virginia Bd. of Elections,* 383 U.S. 663, 16 L. Ed. 2d 169, 86 S. Ct. 1079 (1966); *Williams v. Rhodes,* 393 U.S. 23, 21 L. Ed. 2d 24, 89 S. Ct. 5 (1968); *Sorenson v. Bellingham, supra.* In such instances we have consistently adhered to the judicial duty of strict scrutiny as previously indicated.

In *Sorenson,* where we struck down a Bellingham ordinance which conditioned qualification for office on property ownership, we recognized, at page 550, that "courts have given special treatment to interests they deem fundamental and have required the state to show a 'compelling interest' to justify classification in these areas." There we set forth

[14]*See* Tussman & tenBroek, *The Equal Protection of the Laws,* 37 Calif. L. Rev. 341 (1949) (for pre-1950 equal protection developments); *Developments in the Law—Equal Protection,* 82 Harv. L. Rev. 1065 (1969) (for developments through the 1960's); Gunther, *In Search of Evolving Doctrine on a Changing Court: A Model for a New Equal Protection,* 86 Harv. L. Rev. 1 (1972) (for developments of the 1971 term of the United States Supreme Court).

numerous grounds which require the use of the stricter judicial scrutiny under equal protection. Among the grounds was the effect the ordinance had on the exercise of the fundamental interest of voting, both in its actual use and in its effective use.

The majority opinion fails to explain why the grounds we announced in *Sorenson* for use of the compelling interest standard are not found in this case, and is devoid of any discussion of the fundamental citizen interests of voting and association.

Instead of this necessary evaluation, the majority simply cites *Boomer,* alone, as authority for its holding. As I previously stated, the *Boomer* case is not controlling here because it did not face or dispose of the issue we presently decide, and it did not employ the compelling interest test of the current equal protection doctrine because the strict scrutiny test was not yet part of our jurisprudence.

A careful reading of *Boomer* shows it does not control here on the issue before the court. In it, the appellants argued "the fee required is based on a per centum of the salary of the office for which the person is a candidate, instead of a fixed fee for all candidates alike, and it is this feature that is thought to render the requirement void." The court found this manner of determining the fee amount was reasonable and denied the relief requested. However, no equal protection challenge to the fee scheme itself was raised in that case and this court did not discuss or answer such a question. All that was challenged was the method of fixing the fee, not the fee scheme itself. *Boomer* is totally inappropriate to cite as authority to dispose of the constitutional challenge currently before us.

The same reasoning used in *Sorenson* is exercised in *Bullock.* In *Bullock,* at page 149, a unanimous United States Supreme Court struck down the Texas filing fee system under the strict standard of review because it

erected a system that utilizes the criterion of ability to pay as a condition to being on the ballot, thus excluding some candidates otherwise qualified and denying an un-

determined number of voters the opportunity to vote for candidates of their choice.

The court began its analysis, as we did in *Sorenson,* by recognizing the effect of the legislation under challenge on the people's right to vote and on the effectiveness of that exercise. In *Bullock,* at page 142, *Harper v. Virginia Bd. of Elections, supra,* was recognized as requiring a compelling state interest before the state poll tax of $1.50 could be sustained because "even a minimal price on the exercise of the right to vote constituted an invidious discrimination." In *Sorenson,* we found limitation on the free and effective use of the franchise impermissible absent a compelling state interest.

*Bullock* and *Sorenson* involved state action primarily directed at candidates, but both decisions found the rights of voters and the rights of candidates do not lend themselves to neat separation. Recognizing that legislation pertaining to candidates inherently affects the voters and the exercise of their rights, the *Bullock* court proceeded to determine the fee scheme's impact on voters and found it significant and demanding of strict judicial scrutiny. Such a conclusion is inevitable once it is agreed that "where a candidate representative of a viewpoint of affected voters is prevented from running, those voters who support him have lost an opportunity to cast their votes effectively." *Sorenson v. Bellingham, supra* at 552. This dilution of the vote is no different when the legislation burdens placement on the ballot rather than qualification of the candidate.

In *Bullock,* it was found that the voters were denied the opportunity to vote for a candidate of their choosing because of the fee scheme and that this dilution of voter power rested more heavily on the less affluent. This exact effect is undeniable in this case.

Nevertheless, the majority opinion would have us dismiss the *Bullock* finding and holding on the grounds that the Texas fee was larger than ours, thereby making the Texas fee impermissible and the Washington fee reasonable and constitutional. The court warned against denying rights

under the law by discrete reasoning regarding dollar amounts. Though "there are doubtless some instances of candidates representing the views of voters of modest means who are able to pay the required fee" an emphasis on this ignores the reality that the fee system nevertheless "falls with unequal weight on voters, as well as candidates, according to their economic status." 405 U.S. at 144.

The reference to the fee amounts under the Texas system was intended to show the "patently exclusionary character" of the system, and cannot be understood as a limitation of the rule or reasoning to only those fee systems which are patently defective. The Texas fee scheme found unconstitutional ranged from $50 to $8,900, whereas the Washington fees under challenge range from $150 to $425. Though the Texas fee range had a modest lower limit, below that of Washington, the lower ranges were not saved.

Fee systems, not so patently defective as the upper limits of the Texas scheme, have been struck down subsequent to *Bullock v. Carter,* 405 U.S. 134, 31 L. Ed. 2d 92, 92 S. Ct. 849 (1972). *Dillon v. Fiorina,* 340 F. Supp. 729 (D.N.M. 1972) (6 percent of first-year salary); *Chote v. Brown,* 342 F. Supp. 1353 (N.D. Cal. 1972) (1 percent of first-year salary); *Jennes v. Miller,* 346 F. Supp. 1060 (S.D. Fla. 1972) (10 cents per name on certification petition); *Harper v. Vance,* 342 F. Supp. 136 (N.D. Ala. 1972) (2 percent of first-year salary). These courts in essence found that "In practical effect the fee here involved is indistinguishable from the filing fees struck down by the United States Supreme Court in Bullock v. Carter . . ." *Dillon v. Fiorina, supra* at 730. The fee scheme struck down in *Chote v. Brown, supra,* involved a formula identical to the one we presently face—1 percent of the first year's salary.

Whether the fee scheme involves patently exclusionary fees or those of our system, the conclusion is the same:

Many potential office seekers lacking both personal wealth and affluent backers are in every practical sense precluded [from a benefit obtainable by the affluent], no

matter how qualified they might be and no matter how broad or enthusiastic their popular support.

405 U.S. at 143. Additionally, it is no answer to require voter contribution for

> To the extent . . . the system requires candidates to rely on contributions from voters in order to pay the assessments . . . it tends to deny some voters the opportunity to vote for a candidate of their choosing; at the same time it gives the affluent the power to place on the ballot their own names or the names of persons they favor.

405 U.S. at 144. The application of the *Bullock* standard is compelled by those decisions which have used or recognized it for the rule that strict scrutiny is required where voters or candidates are affected by a classification. *Mancuso v. Taft,* 341 F. Supp. 574, 581 (D.R.I. 1972); *Wellford v. Battaglia,* 343 F. Supp. 143, 146 (D. Del. 1972); *Fidell v. Board of Elections,* 343 F. Supp. 913 (E.D.N.Y. 1972); *Wilson v. Moore,* 346 F. Supp. 635, 640 (N.D. W. Va. 1972); *Zautra v. Miller,* 348 F. Supp. 847, 850 (D. Utah 1972); *Dillon v. Fiorina, supra; Jennes v. Miller, supra; Chote v. Brown, supra. See also The Constitutionality of Candidate Filing Fees,* 70 Mich. L. Rev. 558 (1972); *The Constitutionality of Qualifying Fees for Political Candidates,* 120 U. Pa. L. Rev. 109 (1971).

Even if the compelling interest test is not used and the traditional equal protection test is the applicable standard for this case, the majority simply fails to apply it. The majority does decide a legitimate state interest for the fee exists, citing *Boomer,* but totally fails to discuss or decide the second element of the test, namely, whether the fee scheme is a rational basis by which the state interest may be advanced. *Bullock* compels a conclusion that the fee scheme we have is not a rational basis to advance any legitimate state interest, or necessary to advance any compelling interest.

The majority recites three state interests that are claimed to be justification for the fee scheme. They are:

(1) prevention of overcrowded ballots, (2) assuring seriousness of candidacy, and (3) partially defraying election costs. These interests were agreed to by the parties.

*Bullock* recognized that avoiding overcrowded ballots and assuring candidate seriousness are legitimate state interests but declared *"To say that the filing fee requirement tends to limit the ballot to the more serious candidates is not enough."* (Italics mine.) 405 U.S. at 145. This mere pronouncement of legitimacy by the majority is thus not enough because, as stated in *Bullock*, at page 146, the fee scheme "is extraordinarily ill-fitted to that goal" of advancing state interests.

The fee scheme is ill-fitted because it excludes legitimate as well as frivolous candidates. The effect of the fee is to prevent impoverished candidates from getting onto the ballot, be they frivolous or serious, when persons with sufficient funds may receive ballot placement whether they are serious or frivolous. To those with money the fee scheme is no bar and the state interests of overcrowding and candidate frivolity may be disregarded. To the less affluent the requirement of a fee may foreclose name placement on the ballot. Such arbitrariness solely on the basis of wealth, which treats potential candidates differently, bears no relevance to the state objective, be it legitimate or compelling, and may not stand. Thus only the third state interest, collection of revenue, need be reviewed under the compelling interest standard, for the first two interests, though legitimate, are not advanced by the fee scheme and are thus disposed.

The use of filing fees as a subsidy to the state treasury for election costs is a legitimate state objective and a fee scheme may be a rational basis for such an interest. However, under the standard of review we consider applicable to this case, the compelling interest test, there must be a showing of necessity and necessity did not exist. The United States Supreme Court reasoned in *Bullock*, at page 149:

Without making light of the State's interest in husbanding its revenues, we fail to see such an element of neces-

sity in the State's present means of financing . . . as to justify the resulting incursion on the prerogatives of voters.

The court concluded that the Texas financing scheme ought to "spread the cost among all of the voters in an attempt to distribute the influence without regard to wealth." 405 U.S. at 148.

The state makes no showing here that the financing of election costs was *in actuality* the purpose of the filing fee. The contrary is indicated by the method by which the filing fee amount is determined. It is not related to the costs of elections, nor the costs of ballot production, but is arbitrarily tied to the first year's salary of the office sought by the candidate. This is enough to defeat this ground under either the compelling interest or rational basis test.

It is no longer good law and is now too late to assert, as the majority does, that "the candidates derive some greater benefit from the elective process than do the people at large" and thus may be assessed a fee to use the process. *Bullock* disposed of such a claim and our 1908 decisions (*State ex rel. Boomer v. Nichols,* 50 Wash. 529, 97 P. 733 (1908) and *State ex rel. Zent v. Nichols,* 50 Wash. 508, 97 P. 728 (1908)), seeming to support such a rule, are no longer authority.

The United States Supreme Court, in *Bullock* at page 149, indicates that "in other contexts" a reasonable filing fee scheme might be valid if there were "reasonable alternative means of *access to the ballot*." (Italics mine.) I find no such reasonable alternative under our election statutes and disagree with the majority's conclusion that the write-in provides the "access to the ballot" alternative.

The majority opinion is misled by the write-in possibility as an alternative because it fails to comprehend the particular purpose to which the alternative must provide a remedy. The purpose here is *placement on the ballot* and not merely another method of receiving votes. A focus on this issue of placement on or access to the ballot is conceded by the state in its brief, at page 20, where it states "What

really is at issue is a mere name upon a ballot . . ." The write-in may permit a candidate to continue campaigning for office, but it does not provide access to name placement on the ballot and thus cannot serve as a reasonable alternative to the filing fee.

The alternative methods referred to in *Bullock* as possible valid alternatives to the fee are: nominating petitions, primary elections, or pauper's affidavit. By such methods, legitimate state interests might be advanced without imposing unconstitutional burdens on the indigent candidate. Washington provides none of these.

The majority, without citation of any authority whatsoever, would have us believe that "the election history of this state shows many occasions when sticker candidates have not only made a good showing, but have won the office." This claim, with support, would be surprising, and it is all the more astonishing because of its unsupported character. Occasionally, candidates may have succeeded by this method, but it could hardly be claimed that a write-in or sticker candidate is in as favorable a position as one with his name printed on the ballot. This is even more apparent as the number of voters increases.

The more sensible conclusion would be that "even where operative, the write-ins are no substitute for a place on the ballot." *Williams v. Rhodes*, 393 U.S. 23, 37, 21 L. Ed. 2d 24, 89 S. Ct. 5 (1968) (Douglas, J., concurring). It is inescapable that "to force a candidate to seek election in this fashion is to throw too many hurdles in his path solely because he is without funds to qualify." *Jenness v. Little*, 306 F. Supp. 925, 929 (N.D. Ga. 1969), *appeal dismissed*, 397 U.S. 94, 25 L. Ed. 2d 81, 90 S. Ct. 820 (1970).

The filing fee scheme for name placement on the election ballot is therefore unconstitutional because it denies equal protection of the laws. The fee scheme is not supported by any compelling state interest and no reasonable alternative exists by which an indigent may have access to the ballot.

For many of the reasons given for the unconstitutionality of the filing fee scheme for name placement on the ballot,

the flat $200 fee, under RCW 29.80.050, for space in the candidates' pamphlet, is likewise a denial of equal protection. The pamphlet space is closely tied with the fundamental rights of speech, and the derivative interests of association and political organization. Given the fundamental interests involved, a classification burdening such interests is subject to strict scrutiny under equal protection.

The only interest suggested in support of the fee for space in the pamphlet is to reimburse the state for its costs. This very reimbursement argument was rejected in *Bullock,* as applied to placement on the ballot. There is no good reason to reach any other result on any other analysis when considering the fee for inclusion in the candidates' pamphlet.

The important reason given in *Bullock,* at page 148, for rejecting such contention is:

> [T]he costs do not arise because candidates decide to enter a primary or because the parties decide to conduct one, but because the State has, as a matter of legislative choice, directed that party primaries be held. The State has presumably chosen this course more to benefit the voters than the candidates.

In this case the costs arise because of the state's determination to assist voter decision-making by introducing the candidates to the electorate through a candidates' pamphlet. The financial burden for elections is carried by all taxpayers and the state has not argued a basis for distinguishing the costs of ballots from the costs of candidates' pamphlets. This state, by legislation, has determined that both items are significant to the democratic process and may not invidiously burden access to either. The state heavily subsidizes this candidate information source for the benefit of the voter (*see* RCW 29.80.010) and may not make its benefits available only to those able to afford the state fee. Such discrimination frustrating only some voter assistance is forbidden by the equal protection clause unless it is necessary to promote a compelling state interest. No such necessity or compelling interest has been demonstrated.